## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00349 (TJK)** |
| **v.** | : | |
| | : | |
| **JEFFREY REGISTER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

For the reasons set forth below, the government requests that this Court sentence Jeffrey Register to five months' incarceration and $500 in restitution.[1]

### I.      Introduction

On January 6, 2021, Jeffrey Register mounted the steps of the west terrace of the U.S. Capitol and entered the building just five minutes after the first wave of rioters to have breached it.  He walked in past broken windows and likely over smashed glass.  He ignored officers' clear attempts to clear him and others from the building.  Instead, Register went deeper into the building, running past law enforcement officers who were trying to contain the surge of rioters and witnessing violence and mayhem throughout the building.

Register did not come to take a selfie; he did not simply follow the crowd into the building. He was "aware that Congress was in session and that they were in the process of certifying the vote," and wanted to "help affect Congress's decision" and to "make it into the House chamber

---

[1] A period of probation after a term of incarceration would be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, *see* 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, *see* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

during the certifying process." PSR ¶ 22[2]; Ex. A at 3.[3]  And at a critical moment, with a large mob stalled outside the main entrance to the House Chamber, Register acted.  He seemingly explored for an alternative route to Members of Congress, and ultimately waved the crowd toward an apparently weaker access point: the entrance to the Speaker's Lobby.  Minutes later, and with Register as a witness, Ashli Babbitt was killed while attempting to breach that hastily barricaded entrance.

All told, Register spent half an hour in the building, longer than many misdemeanor defendants.  And after January 6, Register "factory reset" his phone in order to, by his own admission, delete relevant evidence.  He then minimized his conduct and lied to the FBI several times during his initial interview with them.

The question before this Court is where Register stands relative to other misdemeanor Capitol breach defendants.  Register's conduct is significantly more aggravated than that of most misdemeanants.  It is far worse, for example, than that of an individual charged with the same misdemeanor offense who merely walked into the Capitol an hour after it had been breached and stayed inside for five minutes to take a picture.  Indeed, it is among the most aggravated misdemeanor cases to reach sentencing in these Capitol breach prosecutions.  Although Register did not carry a weapon into the building, engage in violence or property destruction, or conspire or coordinate with groups intent on breaching the building, that is true of nearly every misdemeanant Capitol breach defendant; indeed, it is the only reason why these defendants are not charged with serious felonies and are instead permitted to plead guilty to a misdemeanor of their

---

[2] All citations to the Presentence Investigation Report are to the draft report, located at Docket No. 29.
[3] Exhibit A is a report of an interview conducted by two FBI task force officers of Register on February 24, 2021.  Register disputes whether he made the statements recorded in the first paragraph of the third page of Exhibit A, which include those quoted here.

choosing (in Register's case, he chose one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building).  In other words, the fact that Register did not engage in more aggravated, felonious conduct is why he is not facing a likely term of imprisonment of a year or more.  Thus, that fact reveals why he is a misdemeanor defendant, but otherwise indicates little about what his appropriate misdemeanor sentence should be.

The range of potential custodial sentences for these misdemeanor offenses is zero to six months' imprisonment, and the misdemeanor Capitol breach defendants should be arrayed along that sentencing spectrum based on the seriousness of their conduct.  Given Register's conduct and how it compares to other misdemeanor defendants, a sentence of five months' imprisonment is the minimum necessary to satisfy the goals of 18 U.S.C. § 3553(a).

As explained herein, a significant jail sentence is appropriate in this case because (1) he actively led others within the building, by waving them forward, to a critical breach point where rioters almost directly confronted Members of Congress, with the fatal shooting of another rioter by law enforcement the consequence; (2) he admitted his intent was to affect the certification proceeding and, even seven weeks later, and having seen or heard the fatal shooting of a rioter just outside the Speaker's Lobby, he still wished he had been able to enter the House Chamber; (3) he approached and breached the Capitol Building just five minutes after the first wave of rioters, indicating that he was among the initial crowd to surge from the lower west plaza toward the Capitol and overrun police barricades; (4) he spent 30 minutes inside the building, and then more than another hour on U.S. Capitol grounds; (5) he blazed a lengthy path throughout the U.S. Capitol, pushing through the Crypt, National Statuary Hall, and then near the Speaker's Lobby; (6) he ignored officers' clear attempts to clear him and others from the building; (8) he destroyed evidence by factory resetting his phone and then lied to the FBI during his initial interview, twice

denying that he entered the Capitol; and (9) he has a criminal history that, while modest, includes two jail sentences, including one for revocation of probation.

The Court must also, of course, consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. The defendant participated in a riot that actually succeeded in halting the Congressional certification and forced the Vice President of the United States to seek safety. Rather than avoid or retreat from the chaos within the U.S. Capitol that day, Register appeared excited by it, and on several occasions burst past a line of law enforcement officers himself or encouraged or led others to do the same. That conduct, combined with his destruction of evidence following the events of January 6, renders a jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.

### Jeffrey Register's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Register traveled alone from Jacksonville, Florida to Washington, D.C., and stayed the night at a hotel in Arlington, Virginia. The next morning, he went to a rally near the White House during which former President Trump spoke to the crowd. Before that speech ended, Register was already walking to the U.S. Capitol. He joined the large crowd at the

base of the Capitol's west terrace.  After the line of law enforcement officers guarding the northern stairs of that terrace was overrun, Register surged forward with the crowd.

The Capitol building itself was first breached just minutes later, around 2:11 p.m., at the Senate Wing Door.  A rioter smashed out a window using a riot shield, and another rioter jumped through the window and over the broken glass, as depicted in the following photograph.  In the following screenshot, the Court can see the cracks in the glass of the other windows and the glass panes in the doors, from rioters pounding on those windows:



Less than five minutes later, Register was waiting to enter outside that entrance when a loud noise from inside the building caused the crowd to scatter, with several people yelling "gun!" *See* Ex. B at 0:35-0:39.  Register turned around and ran away from the building, as depicted in the screenshot below.  *See id.*  Register is identified in each of the following screenshots either with a red circle or a red arrow.



But, as another rioter's video captured, rioters decided it was merely a rubber bullet that had been fired.  *See* Ex. B at 0:49-0:58.[4]  Register was not deterred.  He returned to the same entrance within a few minutes, and entered the building around 2:16 p.m., as depicted below:



---

[4] Exhibit B includes clips from an open-source video taken by another rioter.

Ex. C at 0:24.  Register later admitted to the FBI that when he entered that door, he saw that the window to the door's left had been "broken."  PSR ¶ 20.  That would have been hard for him to miss, considering that rioters were vaulting through the window as he waited to enter.  *See, e.g.*, Ex. B at 0:36.  Register has also admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so.

Almost immediately, Register had an opportunity to leave the building.  Within a few minutes, Register found himself stuck at another exit from the building—the Senate Carriage Door—and was beyond the metal detector, with the doors to the outside less than ten feet in front of him in the screenshot below.  He is looking out of those doors in this screenshot:



Ex. D at 1:05.  The officers behind Register and to his right were instructing the crowd to leave and pushing the crowd outside, though they did not have complete control over the crowd.  Ex. D at 0:42-1:27; Ex. B at 3:00-4:15 (this video includes sound, including officer statements).  Much of their attention was directed outside; officers eventually formed a line to block even more rioters from breaching the building (though they continued to let rioters leave from within).  Ex. E at 1:29-

1:45.[5]  Register watched this scene, refusing to leave, for roughly 90 seconds.  Ex. D at 0:37-2:07.

Any reasonable person in Register's position would have understood that the officers were

attempting to force everyone to leave and to stop other rioters from entering the building.  And,

when Register first arrived at the exit and for a significant period thereafter, rioters were able to

walk out, before the officers later tried to close the doors. Indeed, around a dozen rioters exited

through this door during the period when Register stood and watched.  Ex. E at 0:0-0:12, 0:19-

0:26, 0:46-0:59, 1:19-1:26, 1:36-1:50.[6]  On at least three occasions, officers touched  Register to

direct him toward the door or prevent him from moving back into the building.  Ex. E at 1:05-1:07,

1:17, 1:26-1:30, 1:50-1:55.  Here is one such example:



---

[5] The quality of Exhibit E is poor for certain stretches.  The government has cited snippets that
are at least clear enough to discern what is happening.
[6] On two occasions, Register gets in line behind other rioters who ultimately exit, then spins
away and does not exit himself.  Ex. E at 1:20-1:26; *id.* at 1:43-1:47; *see* Ex. B at 4:04-4:16.

Nonetheless, Register eventually spun past these officers and went back into the building. Ex. D at 1:52-2:21.[7]  He soon encountered another line of law enforcement officers that was containing the crowd, as captured in another rioter's video:



Ex. B at 5:04.  These officers repeatedly told the crowd that they could not go any further.  *Id.* at 5:04-7:00.  Nonetheless, the crowd pushed forward.  Here is Register at the front of the line, next to the officers:

---

[7] The government anticipates Register will claim he felt unable to leave through this exit.  As the videos show, numerous rioters made their way through the doors while Register was standing there, and Register twice got in line with them before changing his mind.  Moreover, Register then spent almost another *30 minutes* in the building; he never exited.  Indeed, the entrance that he used to enter remained open well after he entered; he could have just left through that same exit.  *See* Ex. C.



Ex. B at 7:21.  A few seconds later, the crowd surged forward together, and Register sprinted past

the officers to get behind them:



Ex. B at 7:40-7:47.  Register then wandered the halls of the U.S. Capitol for nearly another half an

hour.  Here he is appearing to take a video with his cell phone inside the National Statuary Hall at

2:33 p.m.:



Ex. F at 0:31.

       Around 2:40 p.m., Register was part of a crowd of individuals attempting to break into the main entrance to the House Chamber.  The crowd had already barreled through a line of 8 or more U.S. Capitol Police officers defending the Chamber's main entrance.  Ex. B at 7:56-8:50.  At around that point, that entrance was barricaded from the inside[8]:

---

[8] *See* https://www.gettyimages.com/detail/news-photo/capitol-police-officers-point-their-guns-at-a-door-that-was-news-photo/1294931265.



The doors to the Chamber are on the left in the far background in the following screenshot from the CCTV footage, at the west (far) end of the hallway.  Register walked away from the crowd, with a smaller group that explored the open hallway to the Speaker's Lobby.



Ex. G at 1:17.  While exploring, Register and several other rioters discovered the weakly guarded hallway that led directly to the entrance to the Speaker's Lobby.  Ex. H at 0:53-1:15. Upon discovering this alternative route, Register and one other rioter ran toward the crowd excitedly, waving their arms to signal them to follow them around the corner.



Ex. G at 1:28.  Within moments, the crowd followed Register, who continued waving them

forward before running to follow:



Ex. G at 1:40; *see id.* at 1:25-1:45; *see also* Ex. B at 9:45-11:15 (showing the same sequence from another perspective and with sound).

Register reached the barricaded entrance to the Speaker's Lobby shortly after Ashli Babbitt, who had been in the same crowd of rioters as Register. That entrance's doors had large window panes, unlike the main entrance to the Chamber. When Register reached the Speaker's Lobby and saw Members of Congress, he later told the FBI that he thought: "We made it, now

they know we're here."  PSR ¶ 22; Ex. A at 2.  Here is Register, mere feet from the entrance, while the crowd chants "Break it down!  Break it down!" and at least one rioter punches the glass[9]:



Within less than two minutes, Ashli Babbitt was shot and killed at the location to which Register had enthusiastically drawn the crowd.  Register later admitted to the FBI that he was only convinced to leave the building after he heard the gunshot that killed Ms. Babbitt.  Ex. A at 2.

Register left the U.S. Capitol building around 2:45 p.m. through the East Front Upper House Door.  Register remained on U.S. Capitol grounds for over an hour after leaving the building.

*Register's Interview*

Register was interviewed by the FBI on February 24, 2021.  Register admitted being in Washington D.C. and on U.S. Capitol grounds, but twice denied having entered the U.S. Capitol itself.  PSR ¶ 20.  Only after agents pressed him a third time did Register admit that he was inside

---

[9] This video is located here: https://theresistance.video/watch?id=5ff6857e00bac0328da8e888.
Register appears at approximately the 37:38 mark.  Ms. Babbitt is shot at around the 39:10 mark.

the Capitol.  However, Register then denied that he "was ever asked to leave" by law enforcement and denied that he had "ever bypass[ed] any Officers who were attempting to hold security lines while inside."  PSR ¶¶ 20-21.  He further claimed that, right after the sequence described above in which he declined to exit the building, he had simply "pass[ed] several Officers that he described as cool, as if they were allowing people to be inside."  PSR ¶ 21.

Register ultimately admitted that he was aware that Congress was in session and that they were in the process of certifying the vote.  PSR ¶ 22.  Register stated that he thought his "presence at the Capitol would help affect Congress's decision" and that he "wished that they were actually able to make it into the House chamber during the certifying process to show their support for President Trump."  *Id.*

Register stated that he had taken several photographs and one video while inside the U.S. Capitol, but that he had later deleted them.  PSR ¶ 23.  He also admitted that he "performed a factory reset of" his phone "hoping that it would permanently delete any evidence showing that he entered into the Capitol building."[10]  *Id.*

*Later text messages*

Although he told agents that he had reset his phone, Register's device still had a very limited number of text messages on it—all apparently from after his reset—when it was recovered by the FBI.  From that very limited set, the FBI noted the following messages.  On January 12, 2021, Register texted a woman: "Everything is good . . . Just doing my best to keep a low profile."  On January 29, 2021, he texted her admitting that he had "deleted Twitter and Facebook."

---

[10] In a text message that did remain on his phone when it was later recovered by the FBI, Register texted someone that he had "reset [his] phone," to explain why he did not have her contact information saved.

In a text message to his father on March 12, 2021, Register sent a link to an article describing the charges brought against another rioter from Jacksonville, Florida.  He asked: "U see the corrections officer in raiford get arrested?"  His father replied: "No for what?  The protest?"  Register later wrote: "Maybe when this is all said and done, government will provide me with a bumper sticker to give u that says: Proud parent of a Capitol insurrectionist."  Register later texted his father a link to an article about a Capitol riot defendant who alleged he had been assaulted while in jail.  His father texted back: "They've probably been given permission to do it.  D.C. is about 85% black."  Register replied: "Yep, literally an eye for an eye in this case!"  In late April, he texted his father a prediction that he would not be arrested because he did "not post[] anything on social media" and, in his view, had been "up front and honest with them when the[ FBI] came."

Register's device also had instant messages that the FBI was able to partially recover from the device.  These messages were marked as "deleted," and the FBI only recovered "carved" versions of them.  These messages lack a date or timestamp, and do not indicate from whom they came.  However, the content of some of the messages indicates that this discussion occurred between Register and others after Register was first interviewed by the FBI on February 24, 2021.  In addition, the content of these deleted messages indicates that, had he not intentionally deleted evidence, Register's phone would likely have contained evidence of intent or consciousness of guilt.  A sample of the messages is copied below, with messages clearly written by Register in bold (others might also have been written by Register).  This list is not necessarily in order, and is not exhaustive:

"Can we all say hello to our FBI friends on this text ?"

"Just kidding FBI"

"Sounds like your agent won't leak it to the news, he actually seem to have your back to an extent"

**"He's been a great dude so far, hate to find out he's screwing me.  I don't think he is"**

"Oh if he wanted to screw your he'd have arrested you the first time they showed up"

"I'm joking, if it makes the news channel 4 liberal asses will definitely run it"

**"I have Lilyens career to worry about to. Her job is super liberal and me making news and rocking the boat, I'd rather do the jail time"**

"Well no matter what you will be making the news"

"I mean all you did was walk in and walk out.  Not like you stole the Mona Lisa"

"They probably being forced to do it and are like 'this is so stupid we have much more serious shit to worry about'"

"I don't think you will do any jail time.  I'm looking into lawyers"

"Yeah, but politics today are far worst than felonies."

**"Me being asked to turn in my God guns and Trump sweater is all u need to know!"**

The last message is a reference to the sweatshirt that Register wore on January 6, 2021, which reads "God, Guns, and Trump" on the back.  The FBI asked Register to bring it with him when he turned himself in on the charges in this case.

*The Charges and Plea Agreement*

On March 19, 2021, Register was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2). On April 27, 2021, he turned himself in on an outstanding arrest warrant when directed to do so by the FBI.  On May 10, 2021, he was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On October 14, 2021, he chose to plead guilty to Count Four of

the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Register agreed to pay $500 in restitution.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). All of these factors weigh in favor of incarceration here.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms.  By its very nature, the attack defies comparison to other events.

Nonetheless, when looking at Register's individual conduct, we assess that conduct on a spectrum. This Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear: A defendant that personally engaged in violence or destruction would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Register from most other misdemeanor defendants. Accordingly, the zero-to-six-month statutory range in this case already accounts for Register's lack of violence and property destruction; Register cannot bootstrap his way into a lower sentence within that range for the same reason he received that reduced range in the first place.  The question before this Court is how to sentence Register within that range, which depends principally on how Register's offense relates to other misdemeanor defendants.   Register's offense is clearly aggravated when viewed in that lens.

*First*, Register's entry into the building was unlike many misdemeanor defendants.  He entered the building just five minutes after it was first breached, at the location where it was first

breached. Shattered glass was on the floor, and Register himself later admitted that he knew the windows were broken when he entered.  Moreover, just prior to entry, Register ran away from the building when some rioters yelled that there had been gunfire; the rioters later asserted that only rubber bullets had been fired.  But choosing to then enter the building immediately after hearing that potential gunfire—and, at a minimum, serious crowd control weaponry—was being deployed inside against the crowd indicates Register's full consciousness of wrongdoing and a willingness to confront hostile law enforcement inside the U.S. Capitol.

***Second***, Register repeatedly disobeyed the commands of law enforcement inside the building, and least once broke through a police line that was holding the crowd back.  Within minutes of entering, he was just outside the Senate Carriage Door, where the officers present were clearly directing others to leave, attempting to clear the building, and even placing their hands on Register to direct him to the exit or prevent him from going back into the building.  Yet he refused to leave, and instead turned to go deeper into the building.  Then, immediately thereafter, Register encountered a line of officers trying to contain the crowd.  Register ran around the line of officers, as described above.  This type of conduct contributed throughout the day to the breakdown of officers' attempts to control the crowd inside the building, because it was more difficult for them to hold a position with rioters like Register roaming behind them.  Register thus directly contributed to the collapse of that law enforcement line.

Most egregious is Register's conduct at a pivotal moment in the riot.  A mob was positioned outside the House Chamber's main entrance, with members of the House still inside that Chamber. But they were blocked by those doors.  Register frantically encouraged the crowd of rioters to follow him to a potential alternative route to the House Chamber: the hallway to the Speaker's Lobby.  Register bears some personal responsibility, therefore, for bringing a large crowd to one

of the last lines of defense between the rioters and members of the House of Representatives, and to the brink of a direct and potentially violent confrontation with those members.   Indeed, Register's conduct arguably contributed to the circumstances leading to the fatal clash that occurred just minutes later when the rioters breached the weaker access point at the entrance to the Speaker's Lobby after they were stymied at the House Chamber's main entrance.   And it took another rioter being shot within feet of him, in the location where he had urged the crowd to go, for Register to finally leave the building.

*Third*, Register spent over half an hour inside the U.S. Capitol, longer than many misdemeanor defendants.   (For example, it appears from a review of sentencing submissions that only approximately 15% of Capitol breach defendants sentenced for misdemeanors to date spent more than 30 minutes inside the building, and approximately 75% of those sentenced spent less than 30 minutes).   Equally as important, he traced a path throughout much of the U.S. Capitol, traveling from the Senate Wing to the House Wing, going up and down floors, and generally apparently trying to be where the action was.   Because of his extensive travel throughout the building, Register would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm.   And when he did finally leave the building, he did not return home, shaken by what he had seen.   He remained on U.S. Capitol grounds for more than an hour afterward.

*Fourth***,** Register attempted to "factory reset" his phone after January 6 for the admitted purpose of destroying evidence.   This, too, sets him apart from many misdemeanor defendants. Register also deleted his Facebook and Twitter accounts, according to his statements on his cell phone, although it is unclear when that occurred.

23

*Fifth*, the government does not have evidence that Register celebrated or encouraged violence or property destruction, and the government does not have the types of inflammatory social media posts or text messages that it does in some January 6 cases.  But most of the U.S. Capitol's internal CCTV footage does not capture sound, and so many statements from Capitol breach defendants come to the attention of the government through the defendant's own social media accounts or text messages, or from those of the defendant's friends.  Here, the government does not have those because Register destroyed evidence on his phone.  The Court can draw the ordinary inference from intentional destruction of evidence that prejudicial evidence existed on that device, particularly where, as above, what deleted messages were recovered, even months later, appear less innocuous than those that were not deleted.  Register may well have deleted numerous of his own inflammatory statements, either those that he caught on camera on January 6 or those that he messaged to others after.  The Court should not reward Register's wholesale deletion of evidence after January 6 by crediting him for not making such statements or not celebrating the riot that day.

*Sixth*, Register did not demonstrate early and sincere remorse or contrition.  Register met with the FBI in February, before he was arrested, but during that meeting twice lied about going inside the U.S. Capitol building, before ultimately admitting it.  Register also falsely claimed he had not run past law enforcement officers.  And his claim that he was not "ever asked to leave" and that officers were "allowing people to be inside" is remarkable in light of the footage described above in which law enforcement officers repeatedly tried to get the crowd to leave a nearby exit, directed Register toward that exit, or told the crowd they could go no further.  PSR ¶¶ 20-21.

While Register did ultimately decide to plead guilty in October 2021, he is unlike those defendants who expressed early contrition, voluntarily turned themselves in, identified themselves to law enforcement, or turned over their non-deleted cell phones.

In sum, the nature and circumstances of Register's offense weighs heavily in favor of significant incarceration.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Register, unlike many rioters on January 6, has a criminal history, including having had his probation revoked previously.  Register was arrested for Driving While Intoxicated in 2013, and subsequently pled guilty to the misdemeanor offense of Reckless Driving in 2014.  *See* Dkt. 29 at ¶ 29.  He was sentenced to probation, but that probation was then revoked on February 13, 2014, and Register was sentenced to 10 days' jail.  *Id.*

Register was also arrested for driving with a suspended license in 2014.  *Id.* ¶ 30.  He told officers that he did not have his license on him because had left his license at the bar he was coming from.  *Id.*  But a record check revealed that his license was actually suspended due to his DWI arrest.  *Id.*  He was sentenced to 17 days' confinement, with 12 days' suspended.  *Id.*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11] As this Court previously said, it was a "national disgrace."  *See United States v. Stotts*, 21-CR-272 TJK, Dkt. 34 at 31 (Nov. 9, 2021).

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, with the charges ranging from misdemeanors to serious felony charges for assaulting law enforcement officers or conspiring to corruptly interfere with Congress. While Register and many others who breached the building that day have been charged with misdemeanors, their crimes were not minor. These offenses are clearly incomparable to run-of-the-mill misdemeanors.

The seriousness of this offense thus also supports a sentence of incarceration, as it will in most misdemeanor cases arising out of the January 6 riot. Indeed, several courts have by this point made clear that probation is not the baseline or expected sentence for misdemeanant rioters. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan); *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman). Nor should it be. It takes an unusual constellation of mitigating factors and lack of aggravating conduct for probation alone to be an appropriate punishment for taking part in the events of January 6.[12] This was not a

---

Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

[12] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

peaceful protest, or a driving offense in a National Park, or a victimless, minor drug offense.  *See, e.g.*, *United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  Defendants in state courts across the country at times get jail time for regulatory offenses—like Register did in 2014, twice, for a probation revocation and for driving with a suspended license.  The offenses of January 6, 2021 should be punished with a sanction commensurate to their gravity.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  Here, both plainly require a significant sanction.

*General Deterrence*

General deterrence may be the most compelling reason to impose a sentence of incarceration in this and most other cases. The violence at the Capitol on January 6 was intended to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. This is the most important factor that this Court must consider.

*Specific Deterrence*

A significant sentence is also necessary to deter Register specifically. Register's conduct is, for the reasons described above, more aggravated than many misdemeanants. He did not comply with the obvious desire of law enforcement to leave the building. He was willing to run past law enforcement officers who were trying to hold back the crowd. And he was willing to

28

encourage or redirect the mob that day. He seems to have been attracted to the mayhem that occurred inside the U.S. Capitol, and to have sought it out.

Register told the FBI exactly why he committed these offenses. It was not because he simply followed a crowd, or was curious. His mission was to get into the House Chamber to affect the outcome of the congressional proceeding. He told the FBI he was "aware that Congress was in session and that they were in the process of certifying the vote," and he "felt as though his presence at the Capitol would help affect Congress's decision." He wanted Members of Congress to "know we're here" inside the U.S. Capitol. He told the FBI that he "wished that they were actually able to make it into the House chamber during the certifying process." PSR ¶ 22. And that is the sanitized version of the story that Register was willing to tell the FBI almost two months later. But it is still telling for two reasons. First, it confirms why Register waved the crowd toward another, weaker access point to the House Chamber—he actually wanted them to get in. Second, Register remained unwavering that he wished they had made it into the House Chamber even after seeing or hearing another rioter, Ashli Babbitt, shot and killed within mere feet of him while seemingly trying to do just that. Register's comments indicate either a total lack of awareness of, or worse, a knowing dismissal of, the danger posed to Members of Congress, law enforcement, and to individual rioters because of the breach of the U.S. Capitol. Again, that differentiates Register from other rioters, and his sentence should reflect as much.

Finally, of course, Register's destruction of evidence and lying to the FBI also indicates a lack of remorse in the short term, as does Register's joke about being an insurrectionist and his participation in communications with individuals who referred to the events of January 6 as a "protest," who claimed he did nothing more than walk in and out, or who otherwise minimized the seriousness of the offense. Register's aggravated conduct, his intent and lack of early remorse,

and his willingness to destroy evidence and then lie to the FBI all support the need for specific deterrence in this case.

In considering specific deterrence, the Court should also consider the sentences that Register has himself received for misdemeanors in prior cases. For example, in 2014, he was sentenced for the misdemeanor of driving a vehicle with a suspended license. That is a victimless, purely regulatory offense, and one that thousands of people commit every day. Yet he received a sentence of 17 days in jail, with 12 days suspended. Register's actions in breaching the nation's legislative seat of power, overrunning law enforcement, and redirecting an angry mob to within yards of a direct confrontation with Members of Congress, all while the Vice President hid, are plainly many times more serious, and more deserving of punishment, than his prior misdemeanor offenses. Rather than an offense that is committed by thousands each day, his is an offense unprecedented in the history of this Nation.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

A comparison to other rioters also makes clear that a sentence of at least five months' imprisonment is appropriate.[13] *See* 18 U.S.C. § 3553(a)(6) (noting "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" in imposing sentences).

As with any criminal prosecution, each case is different, and that principle remains equally as important in these cases. Although most of the misdemeanor defendants sentenced for their conduct on January 6, 2021 went inside the U.S. Capitol, numerous factors distinguish those

---

[13] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants in cases where the government has requested incarceration. *See* Ex. I.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

defendants from one another: their personal and criminal history, their statements on social media or otherwise relating to intent, how they entered the Capitol, how long they remained inside, what they did while inside, whether they destroyed evidence, whether they lied to the FBI. All of those factors, and others like remorse or cooperation, help explain the differing recommendations and sentences handed out across these cases. *See, e.g.*, *United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Those factors are no different in kind from those that courts routinely rely upon to uphold disparities—of years—between co-defendants or between similarly situated (e.g.) drug or gun defendants. *See, e.g.*, *United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (disparity between defendant's 100-month term of incarceration and 40-year term of supervised release and co-defendants' "less jail time and substantially smaller periods of supervised release" was warranted solely by defendant's child pornography being "much more aggressive and troubling than the images distributed by other offenders").[14] Certainly, the Court should not emphasize avoiding unwarranted disparities more in these misdemeanor cases, in which any such disparity would be measured in days or months, not years.

Assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. Here, the appropriate pool is comprised of other Capitol breach offenders, because the Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including

---

[14] In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Recognizing that the pool of sentenced individuals is still not very large, a judge cannot "consider all of the sentences not yet imposed" in reviewing disparities. *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally Accardi*, 669 F.3d at 346 ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences . . . .").

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on other rioters who engaged in destruction of evidence—almost all of whom were sentenced to jail—as well as the sentence this Court imposed on Tamh Dinh Pham for reference.  First, in the cases involving rioters' clear destruction of evidence, the courts have imposed sentences of at least 45 days' incarceration in all but one case, and several of those cases involved less aggravating conduct than that here.  *See United States v. Mazzocco*, 21-CR-54-TSC, Dkt. 34; *United States v. Jancart*, 21-CR-148-JEB, Dkt. 33; *United States v. Rau*, 21-CR-467-JEB, Dkt. 21; *United States v. Bauer*, 21-CR-49-TSC, Dkt. 44; *United States v. Camper*, 21-CR-325-CKK, Dkt. 41.[15]

---

[15] The exception, *United States v. Gruppo*, 21-CR-391-BAH, involved a rioter who spent just 6 minutes inside the building, entered nearly 40 minutes after Register did, and engaged in little aggravated conduct within the building, *see id.* Dkt. 24 at 7-9.  He was sentenced to 90 days' home confinement.  This case is clearly significantly more aggravated.

Second, this Court recently imposed a sentence of 45 days' imprisonment in the case of *United States v. Pham*, 21-CR-109-TJK.   The government requested a sentence of 60 days' imprisonment there. *See id.*, Dkt. 36 at 1.   Register's conduct is more aggravated in nearly every respect.   Register has a criminal history, including a revoked term of probation.   Pham had no criminal history, and had been a law enforcement officer. *Id.* at 18.   Register spent longer inside the building than did Pham, and entered with the first wave of rioters, unlike Pham. *Id.* at 1-2, 6. When later interviewed, Pham had moved photographs into his deleted photographs folder, but still permitted law enforcement to review them, *see id.* at 12, whereas Register took the more significant step of factory resetting his phone to eliminate all evidence.   Finally, their conduct inside the Capitol is very different.   Register ran past a line of law enforcement as it was being breached and ignored officers who were trying to clear the building, including by physically directing him to the exit.   Pham did not.   Most glaringly, when a rancorous mob stood just outside the barricaded door of the House Chamber, Register actively tried to find that mob a new route to reach Members of Congress, and then waved them toward it when it was located, leading eventually to the fatal use of force by an officer.   Pham engaged in no such conduct and did not lead others while inside.

Register also engaged in clear obstructive conduct.   On top of resetting his phone, when the FBI caught up to him and interviewed him, he twice denied entering the building, and later lied about his conduct inside, in order to minimize that conduct.   And what limited text messages Register did leave on his phone—likely only the tip of the iceberg—indicate that instead of being remorseful over his role, as late as March 2021, he was joking with his father about being a "Capitol insurrectionist," and with his friends about these investigations and his conduct not being

serious.  Register's sentence ought to reflect his criminal history and the more serious misconduct in which he engaged on January 6.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.  In other words, it would be neither unusual nor unexpected for Capitol breach defendants to receive differing sentences even for somewhat similar conduct. Again, the same is true for other federal defendants.

## V.      Conclusion

The government recommends that this Court sentence Register to five months' incarceration and $500 in restitution. Such a sentence promotes respect for the law and deters future crime, and most importantly accurately reflects the seriousness of the offense in this case. Register's conduct is among the most aggravated among misdemeanants charged with offenses relating to the Capitol riot.  His case involves obstructive conduct, false statements to law enforcement, a lack of early remorse, and leading others while inside the Capitol.  He should be sanctioned accordingly.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov