# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-00349 (TJK)** |
| **JEFFREY REGISTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

### Introduction

On February 24, 2022, Mr. Jeffrey Register, pursuant to a guilty plea, will appear before this Court to be sentenced for Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Mr. Register respectfully requests, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), the Court impose a sentence of probation, with the additional conditions of $500 in restitution and community service.

### RELEVANT FACTS AND BACKGROUND

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1]  The rally was set for January 6, 2021, the same date Congress was set to certify President Joseph Biden as the winner.

---

[1]     President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[3]  Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are

---

[2]     Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3]     *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4]     *Id*.

[5]     *Id*.

[6]     *Id*.

all watching."[7]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10]  At approximately 12:50 p.m., some of those same attendees breached the outer barricades of the U.S. Capitol grounds.[11] The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12]  The

---

[7]      *Id.*

[8]      *Id.*

[9]      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]     *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]     *Id.*

[12]     *Id.*

MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West. But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building. Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Following the events of January 6, 2021, law enforcement requested and obtained search warrants from Google LLC, in an attempt to locate individuals whose electronic devices were inside the Capitol building. *See* ECF No. 1. Google returned the government's request and Mr. Register's mobile device was identified. *Id*. Further, law enforcement was able to identify Mr. Register inside the Capitol from an open source video. *Id*. Three weeks after viewing that video, law enforcement traveled to Mr. Register's work and he consented to a voluntary interview. During that interview, Mr. Register admitted he went inside the Capitol, and three weeks later, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr.

---

[13]     *Id*.

[14]     *Id*.

4

Register with three misdemeanor offenses. *Id.* Following the issuance of the criminal complaint and arrest warrant, and working in conjunction with the U.S. Marshals and his local sheriff's department, Mr. Register voluntarily surrendered, bringing with him his cell phone and an item of clothing he wore on January 6. *See* ECF No. 5.

On April 30, 2021, Mr. Register had an initial appearance in the U.S. District Court for the District of Columbia. Magistrate Harvey released him on his personal recognizance subject to conditions. *See* ECF No. 8. On May 10, 2021, the government filed an information against Mr. Register, formally alleging the charges of: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See* ECF No. 7. On October 14, 2021, this Court reviewed and accepted Mr. Register's plea of guilty to count four of the information. *See* ECF Nos. 24-26.

## LEGAL PRINCIPLES

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. Additionally, pursuant to 18 U.S.C. § 3583(b)(3), the Court is prohibited from imposing a term of supervised release for a petty offense. Further, if the Court imposes active, continuous incarceration, 18 U.S.C. § 3551 disallows it from also imposing an additional period of probation following the incarceration. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH),

ECF No. 110, 113, & 125. Therefore, because of the nature of the plea agreement in this case, the Court is left with a dichotomous choice: either impose active incarceration <u>or</u> a term of probation with conditions.[15]

Because the Guidelines do not apply, the Court is directed to look solely to the factors enumerated in 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id*. at 2(B-D).  Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with

---

[15]     Though the government cites the unpublished Fourth Circuit opinion, *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009) to contend otherwise, the judges in the D.D.C. have largely agreed that incarceration and probation for a petty offense is an illicit sentence. Indeed, in the instant case, the government itself is not affirmatively requesting both incarceration and probation, merely stating instead that it "would be appropriate."  *See* ECF No. 30 at 1.  Moreover, <u>only one</u> D.D.C. judge has imposed both active incarceration and supervision for a petty misdemeanor, the Honorable Kollar-Kotelly in *United States v. Virginia Spencer*, 21-cr-00147-2.  However, in that case, the Honorable Kollar-Ketelly imposed both incarceration and <u>supervised release</u>, an unquestionably unlawful disposition for a petty misdemeanor.  Further, undersigned understands that the Honorable Kollar-Ketelly was not presented with the knowledge that she was prohibited from imposing both, and that no other judge had done so. Additionally, counsel understands that the judgement in that case is being considered for appeal. *See* ECF No. 66. If the Court would like additional briefing on this issue, undersigned will gladly provide it.

similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense."  *Id*. at (3), (6), & (7).

## ARGUMENT

Mr. Register, a 39-year-old man with minimal criminal history,[16] is worthy of a probationary sentence in this case.  While the nature and circumstances of the January 6 events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of active incarceration.  Rather, probation with community service and restitution adequately meets the purposes of sentencing.  A probationary sentence would provide adequate deterrence to Mr. Register, avoid an unwarranted sentencing disparity among similarly-placed January 6 defendants, and protect Mr. Register's ability to provide timely restitution.

### I.   Nature and Circumstances of Mr. Register's Offense

The events of January 6 cannot, and should not, be minimized.  When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage.  Five individuals lost their lives.[17]  And because of the breach, the 2020 Presidential Electoral College count was delayed.  All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost

---

[16]     Mr. Register's only criminal history are eight-year-old, traffic-related convictions.

[17]     Ashli Babbitt was killed after she refused to comply with police commands.  Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd.  Rosanne Boyland was crushed to death.  Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6.  *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

friends, and some lost confidence in the American political system's ability to defend against

threats to the peaceful transfer of power.

Recently, during a sentencing of another January 6 non-violent defendant, the Honorable

Mehta commented,

> There is some mitigation here.  [The Defendant] didn't plan this episode, he didn't
> purposely come to Washington, D.C., to storm the Capitol. The fact remains that he and
> others were called to Washington, D.C., by an elected official, told to walk to the Capitol
> by an elected official. . . People [] were told lies, falsehoods, told the election was stolen
> when it really wasn't. . . I think you are a pawn . . . You are a pawn in a game that's
> played and directed by people who should know better.[18]

Similarly, Mr. Register, also fed lies and disingenuous directions by people that should have

known better, deserves consideration from this Court.  He was not the cause of January 6, nor

was he in the classification of people that caused physical harm to the Capitol or others.  He

entered the building, but his unlawful entrance cannot, and should not, be conflated with the

many other, wider, failures that occurred that day.[19]  Arguably, the former president, the rally's

organizers and speakers, and other nefarious, organized groups contributed to the chaos and are

greatly more culpable for what happened on January 6.

Turning to Mr. Register's conduct specifically, he traveled alone from Florida to

Washington, D.C. on January 5 at the behest of the former president's invitation.  He did not

---

[18]    *See* Steve Benen, *Judge blames Jan. 6 on Trump, tells rioter he was 'a pawn'*, MSNBC
(Nov. 22, 2021), available at https://www.msnbc.com/rachel-maddow-show/judge-blames-jan-6-
trump-tells-rioter-he-was-pawn-n1284327.

[19]    There are a variety of factors that led to the Capitol being breached, including "paralysis"
"exacerbated by the patchwork nature of security across a city where responsibilities are split
between local and federal authorities" and "driven by unique breakdowns inside each law
enforcement agency."  *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*,
The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-
insurrection/?itid=hp-top-table-main.

communicate nor organize his arrival with larger groups or affiliated individuals, communicating his travel plans only to his wife, step-daughter, and members of his fantasy football league.  He then stayed overnight in a hotel in Alexandria, Virginia and in the morning of January 6, rode the metro to the Ellipse.  While at the rally, Mr. Register listened to, and became enthused by the speeches.  Even while he walked toward the Capitol after leaving the rally, Mr. Register had no intention of entering the building.  He merely believed he was going with others to peacefully, albeit loudly, protest outside.

However, by the time Mr. Register arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced and people were streaming onto the Capitol grounds.  Personally, Mr. Register met no police resistance to his continual marching toward the Capitol building, though this is likely because by the time he arrived at the building, officers, having already scuffled with the earlier wave of protestors, had retreated to the upper terraces.  He made his way through the scaffolding that had been erected for the upcoming inauguration and joined with others on the steps of the Capitol Building.  By this time, the U.S. Capitol Police Officers had retreated into the building itself.

At approximately 2:13 p.m., an individual in the crowd broke a window next to the Senate Wing Doors, causing the building's first, and arguably largest, breach.[20]  Minutes later, upon entry into the building, members of the crowd broke open the closed Senate Wing Doors.  This allowed a much larger group, including Mr. Register, to come inside.  He, along with

---

[20]     *See United States v. Dominic Pezzola*, Crim No. 21-cr-00052 (TJK); *United States v. Michael Sparks*, Crim. No. 21-cr-00087 (TJK).

hundreds of others, flooded into the corridor.  Notably, at the time and place of his entrance, no law enforcement were present.[21]

Mr. Register entered through the opened doors, turned to his left, and began walking down a corridor, unsure of where he was going.  Without knowing it, Mr. Register walked toward an exit point, the Senate Carriage Doors, where a few officers were stationed.  The officers calmly signaled for Mr. Register and the others to continue down the corridor and out of the doors.  Mr. Register began to comply, but simultaneous with his arrival at the brink of the doors, commotion erupted.  Individuals outside the building, seeing the open Senate Carriage Doors, noted it as a possible entry point and began to alert others to come that way.  Officers, seeing the forming crowd, formed a line at the doors and attempted to close them.  Mr. Register, caught behind the police line, watched for a few moments, unsure of how to proceed.  Eventually, when the officers began to close the doors, and as the clash between those outside the building and the officers inside flared, Mr. Register, not wanting to get caught in the chaos, turned and walked back up the hallway from which he came.[22]

When he did so, he backtracked to the Senate Wing Doors, which were continuing to facilitate a flood of individuals into the building.  He then followed the crowd through the Crypt and National Statuary Hall, and eventually settled at a location by several House Chamber entry

---

[21]    This is consistent with CCTV footage showing Mr. Register's entrance into the building.  *See* Gov't Ex. C.  It is not precisely known when officers re-emerged to secure the Senate Wing Doors, but by at least 2:45 p.m. (approximately the same time Mr. Register is exiting the Capitol building through a different door), Capitol police officers once again become visible, having closed the doors in an attempt to hold off further unlawful entrants.  That attempt failed just minutes later when a large portion of the crowd pushed past officers and into the building.

[22]    The government included a screenshot of an individual speaking with police officers in the hallway of the Senate Carriage Door on page 9 of its sentencing memo.  However, the Court should note that the individual depicted in the sage-colored jacket is not Mr. Register.

points.  Importantly, Mr. Register did not realize this was the House Chamber, and did not get anywhere near the doors.[23]  Instead, the crowd bottlenecked at this location, and Mr. Register along with a few others, separated from the dense conditions, seeking relief.  He and the others walked down a nearby corridor, which eventually led to an area outside of the Speaker of the House's Lobby.  A few of the individuals with Mr. Register turned and alerted others to the newly-found hallway.

After watching others scream and motion, Mr. Register waved down the hallway at the crew bottlenecked at the House Chambers.  Eerily, *just before* he did so, Ashli Babbitt, having been previously told of the space by another, passed him on her way to the Lobby doors.  Importantly, Mr. Register did not lead Ashli Babbitt to the doors and he was not the first to signal the location to others.  Instead, now encompassed in a huge throng of others, Mr. Register returned to the doors of the Speaker of the House's Lobby.

However, the crowd at that location again became dense, and after just a few minutes, Mr. Register left, again seeking relief.  He stepped into a nearby restroom and it was while he was in this restroom that he heard the sound of a gunshot.[24]  Emerging from the restroom quickly, Mr. Register saw people standing over a body.  He heard others scream, "They shot her! They killed her!"  Panicked and feeling the gravity of chaos around him, Mr. Register found the nearest exit, and left the building, spending a total of approximately 30 minutes inside.

---

[23]  The image depicted on page 12 of the government's sentencing memo implies that Mr. Register was just on the other end of that confrontation.  He was not.

[24]  Any suggestion that Mr. Register somehow led or is responsible for the death of Ashli Babbitt is thoroughly disingenuous.  Ms. Babbit was already in the hallway by the Speaker's Lobby prior to Mr. Register "waving" others to that location.  Additionally, Mr. Register was no longer in the hallway when she was shot, deciding to leave that location minutes before due to its dense composition and resulting chaos.

However, after he left the building, Mr. Register remained on the Capitol grounds searching for a cell phone signal and conferring with others about the state of the injured woman. He eventually did leave the grounds, walked to the nearest metro stop, and traveled back to his hotel room in Alexandria.  When he got there, anxious to see if the news was covering the wounded woman, he turned on his television and watched, horrified, at what had taken place.  He began to feel sick to his stomach, and was awash in shame and fear.  He packed his things and left in the early morning hours of January 7 for home, eager to embrace his wife and step-daughter.

In the days following January 6, 2021, Mr. Register continued to be horrified at what happened, and what he was a part of.  This was especially true when he learned that Ashli Babbitt did not survive.  Though Mr. Register tried to feign unconcern in text message conversations with his father and friends, on the inside, he was shaken.[25]  He stopped being able to sleep, and in a panicked moment, tried to delete photos from his phone, believing, like a boy whistling in the dark, that if there were no pictures, maybe it did not happen.  Then, continuing to watch the coverage of law enforcement's aggressive arrest response, Mr. Register again made an irresponsible and fear-based decision: he factory re-set his cell phone.

However, when FBI agents surprised Mr. Register at his work on February 24, 2021, though fearful, he agreed to a voluntary interview.  At first, he equivocated on his entrance into

---

[25]     The government points to a text message conversation between Mr. Register and his father sent on March 21, 2021.  *See* ECF No. 30 at 18.  In that conversation, Mr. Register made an off-colored joke that his father may receive a bumper sticker.  However, that message was aimed at diffusing his father's worries over Mr. Register's pending arrest (by that point, the FBI had spoken to Mr. Register and he had admitted his crime), and are not reflective of a true lack of remorse.  Additionally, the "carved" text message conversations that took place between Mr. Register and others shed little light on Mr. Register's character.  Instead, the text messages convey that he liked the FBI agent who interviewed him, and was concerned his actions may affect his wife's job, and was honest with law enforcement.  *Id*. at 18-19.

the building, but his conscious burned at him to tell the truth.  He admitted his unlawful entrance

and stated, he "knew he was wrong when the girl got shot."  When agents requested to see his

cell phone, Mr. Register admitted he had factory-reset the device in fear.  Fortunately, however,

when agents later searched his phone with his consent, the government was still able to recover

some of the device's messages.

To suggest that Mr. Register's conduct was, "among the most aggravated misdemeanor

cases to reach sentencing in these Capitol breach prosecutions", is simply an exaggerated

claim.[26]  In truth, Mr. Register unlawfully assembled at the U.S. Capitol, walked through an

already breached door and down a corridor.  He failed to leave at his first opportunity when that

exit point became a focal point of chaos and entry for others.  Instead, he walked further into the

building and encouraged others to follow him when he saw a hallway not choked with people.

Then, he walked into a restroom, heard a gunshot, and saw a body.  Panicked, he left the building

right away.  Admittedly, Mr. Register did stay on the Capitol grounds for a time after exiting the

building, and, showing further poor judgment, he did delete photos and factory re-set his cell

phone.  With the hyperbole removed, those are the facts of Mr. Register's conduct on January 6.

However, the government, in an attempt to sway this Court towards incarceration,

repeatedly attributes heavy weight to a summary of Mr. Register's unrecorded, un-Mirandized,

consensual interview with the FBI, the contents of which are disputed and were not made part of

his agreed statement of offense.[27]  In that 302, an FBI agent wrote that Mr. Register purportedly

---

[26]     For a more in-depth discussion of aggravated misdemeanor January 6 defendants, see
section III on sentencing disparities, including footnote 41.

[27]     Though this 302 was released to defense in discovery, it was not discussed by the parties
prior to the government providing it to the U.S. Probation Officer during preparation of its
presentence investigation report.  When information from that 302 was written into the draft
report, undersigned contacted the government and inquired.  The government noted that it was

explained his "intent was to affect the certification proceeding."  However, notably, even armed

with that kind of alleged statement, the government neglected to charge Mr. Register with a

violation of 18 U.S.C. § 1512(c)(2), only levying misdemeanor charges.[28]  Additionally, the

government failed to offer one of the more serious misdemeanor charges as its proposed plea.

Both the decision to charge Mr. Register with only misdemeanors and the government's decision

to offer Mr. Register a plea to the petty misdemeanor, belie any claim that Mr. Register is one of

the "most aggravated" misdemeanants.

Instead, it is far more likely that the Department of Justice, in attempting to respond to

criticism in its approach to January 6 cases, is now pushing for harsher penalties at sentencing.

And in doing so, the government is failing to acknowledge its own charging and plea decisions,

and ignoring Mr. Register's cooperation and acceptance of responsibility.  For his part, Mr.

Register disputes ever making such statements to the FBI, and even went so far as challenging

their veracity at his first court appearance in Florida.[29]  Moreover, Mr. Register played no role in

organizing January 6, nor did he deliver inciting and aggressive commentary to an already

---

not aware Mr. Register factually disputed this piece of discovery.  However, to expect defense
counsel to affirmatively concede or deny every allegation released in discovery, is simply
untenable, especially when it was not made part of the statement of offense.  In any case, the
government agreed the facts of that 302 are in dispute and undersigned has objected to their
inclusion in the final PSR, just as it takes issue with their inclusion in the government's
sentencing memorandum.

[28]     This lends credence to the argument that the government is charging violations of 18
U.S.C. § 1512(c)(2) capriciously.

[29]     *See Nassau County man facing federal charges related to Capitol riot*, First Coast News
(April 27, 2021), available at https://www.firstcoastnews.com/article/news/local/man-makes-
tuesday-appearance-in-jacksonville-on-charges-related-to-capitol-riots/77-c9c8a930-f2ec-45c6-
b342-11addbdea146 ("During the hearing, the prosecution said Register admitted to the FBI that
he went to the Capitol to disrupt the government. However, the defense argued the statement was
not accurate . . .").

energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from

Donald Trump" or engage in "trial by combat."  Additionally, Mr. Register did not participate in

the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner

doors or windows of the U.S. Capitol.  He did not damage or steal any property while inside, and

at no time did he assault or threaten law enforcement.  He did not bring any weapons with him,

and he did not travel from Florida to D.C. with the intention to subvert democracy.

 The truth is, Mr. Register submitted to a voluntary interview and confessed to his crime.

He was forthright about how he deleted photos and factory re-set his phone.[30]  Then, following

the interview, he provided six photos from his trip to the Capitol, including a picture of his

parking pass from his hotel.  When an officer from his local police department contacted him

about his arrest warrant, Mr. Register voluntarily surrendered, and brought his cell phone and the

sweatshirt he wore on January 6 with him.  Upon his arrest, he consented to a search of his cell

phone's contents, sparing the need for agents to obtain a search warrant.  Moreover, following

both his initial appearances in Florida and D.C., Mr. Register fully complied with his pretrial

release conditions.[31]  Finally, when undersigned conveyed and explained the formalized plea

---

[30]      Though the government claims that Mr. Register deleted his Facebook and Twitter
accounts and its "unclear when he did so", its agent noted in Exhibit A that he deleted his
Facebook a month prior to January 6.  Additionally, though the government implies that Mr.
Register's social media accounts may have contained incriminating information, it does not
appear the government sought a grand jury subpoena or search warrant to access Mr. Register's
old Facebook, Twitter, or Parlor accounts which could have provided it with independent
verification that Mr. Register did not, in fact, make boastful, unremorseful statements on social
media.

[31]      On December 27, 2021, undersigned spoke with Mr. Register's Pre-Trial Officer, Ms.
Kimberly Barrett.  During that phone call, Ms. Barrett expressed that Mr. Register was
"exceptional" while on supervision, stating that if Mr. Register was being sentenced in her
district, she would have written a letter to the presiding judge about his outstanding compliance.
She noted that he reported, "almost ritualistically" with an intense attention to detail, and that
"another example of his abundant compliance," was his fight to gain employment after losing his
job.  She noted that he "was very honest with prospective employers about his case, and

offer to Mr. Register in the last week of September, he signed and transmitted the paperwork back within one week.  He had no intention of disrupting the certification or harming anyone, leaving little defensible justification for a sentence of incarceration, much less, five months.

## II.    Mr. Register's History and Characteristics

Born in 1982, Mr. Register was the younger of two boys from the union of Eileen and Bill Register.  Growing up, he lacked parental oversight and stability, but despite that, emerged with an honest, industrious spirit, which he dutifully carried into his roles as husband and step-father.

For as long as Mr. Register can remember, his parents were addicted to crack-cocaine, a veritable plague that affected and tore apart many families in the 1980s.  He remembers his mother and father leaving him home alone with his older brother well before either one of them could adequately care for themselves.  Throughout his childhood, he was made painfully aware that his welfare would always come second to his parent's use of illicit substances, which left him feeling alone and unloved.  Adding to this insecurity, because both of his parents were highly addicted to the drug, neither one could maintain stable employment, which in turn led to destabilized housing situations for the boys.

In fact, at one point, Mr. Register's grandparents located him alone in a trailer, where he had been left for days with no access to food or sanitary products.  As a result, his grandparents took custody of the boys for a time.  When Mr. Register was 16, his father got sober and began working as a long-haul truck driver.  Wishing to provide for his boys, newly sober, and newly

---

communicated with me every step of the way."  She even noted that it was Mr. Register who reminded Ms. Barrett he needed to call her every week, instead of every month as she suggested, due to his D.C. pretrial release condition order.  She maintained that "all of these [examples] show his level of commitment to being successful" while on release.

divorced from Mr. Register's mother who maintained her addiction, Mr. Register's father rented a small apartment for his sons to live while they finished out high school.  While good intentioned, and obviously an improvement from being left alone in a trailer, Mr. Register still lacked structured, parental supervision since his father's truck driving schedule did not allow him to be at the apartment often.  With little guidance and support, Mr. Register made the poor decision to leave high school and start working.

However, work he did.  Mr. Register took employment everywhere he could get it; working at a Walmart Distribution Center, as a roofer, as a landscaper, as an underground utilities installer, and at a Michael's Distribution Center before he gained lasting, benefited employment in the warehouse of Keurig/Dr. Pepper.  Once employed for Keurig/Dr. Pepper, Mr. Register began to enjoy stability and quickly rose to a lead position at the company.

For over 12 tireless years, Mr. Register devoted himself to his job and while there, he met Lilyen, his wife and best friend.  The pair married after only a month of dating, but remain committed to each other 12 happy years later.[32]  Mr. Register, in marrying Lilyen, counts himself as blessed to have also gained a step-daughter, A.J., whom was just five years old at the time of their marriage.  Now at the age of 17, A.J. calls Mr. Register "dad" and Mr. Register, the doting father that he is, considers her to be "the pride and joy of the family."  He has supported his step-daughter and her mother through the years, even paying for Lilyen to go back to school and complete college.  A.J., now 17 and poised for college herself, looks forward to her dad being at her graduation ceremony in May.  In turn and in the meantime, Mr. Register is "helping her get her math scores up" in preparation for her SATs.[33]

---

[32]    *See* Ex. 1: Letter from Lilyen Register.

[33]    *See* Ex. 2: Letter and picture from A.J. (filed under seal).

Unfortunately though, due to the instant case, Mr. Register was terminated from his job at Keurig/Dr. Pepper shortly after his arrest. The company, citing "public relations", fired him, failing to wait for the case's disposition. Notwithstanding this set-back, Mr. Register ploughed ahead. He took his commercial driver's license test and passed it within a month, allowing him to apply for employment with trucking companies. He filled out job applications every single day and finally, in September, was able to secure employment as a Lead Warehouse Associate at a distribution company. Wishing to be completely transparent, Mr. Register alerted his prospective employer at the time of his interview about his pending legal case. Despite the legal uncertainties, the company still hired him, and within a short time, he was promoted. He remains a valuable and much-loved employee.[34]

In sum, Mr. Register is a hard-working family man who has devoted himself to his stepdaughter and wife. He lost his long-time job as a result of this case, but was able to pick himself back up and start anew. Mr. Register made a mistake on January 6, but it is a mistake that is inconsistent with his character, and will not be repeated. Given that this event was an aberration in his otherwise admirable life, Mr. Register's full history and characteristics support a probationary sentence.

### III.   A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Register to probation would not contribute to an unwarranted sentencing disparity since many of the resolved January 6 defendants were sentenced to precisely that: probation without active incarceration. So far, of the 59 January 6 defendants sentenced for violations of 40 U.S.C. § 5104(e)(2)(G) or (D), a full 20 of them received sentences of straight

---

[34]    *See* Ex. 3: Letter from Jefty Sanchez.

probation without incarceration or home detention.[35]   Another 17 received sentences of

probation with some period of home detention.[36]   Together, that means a *majority* of defendants

(37 of the 59, or 63%), were <u>not</u> sentenced to active incarceration.

Twenty-two 40 U.S.C. § 5104(e)(2)(G) or (D) defendants have received some active

incarceration, but those cases appear highly distinguishable from Mr. Register's.[37]   Six of the

cases involved defendants sentenced by the Honorable Tanya S. Chutkan who, to date, has

---

[35]     *See United States v. Morgan-Lloyd*, 21-cr-00164 (sentenced to 36 months' probation); *United States v. Ehrke*, 21-cr-00097 (36 months' probation); *United States v. Hiles*, 21-cr-00155 (24 months' probation); *United States v. Doyle*, 21-cr-00324 (2 months' probation); *United States v. Rosa*, 21-cr-00068 (12 months' probation); *United States v. Gallagher*, 21-00041 (24 months' probation); *United States v. Vinson, et al.*, 21-cr-0355 (5 years' probation for each); *United States v. Sanders*, 21-cr-00384 (36 months' probation); *United States v. Cordon*, 21-cr-00269 (2 months' probation); *United States v. Wilkerson*, 21-cr-00302 (36 months' probation); *United States v. Wrigley*, 21-cr-00042 (18 months' probation); *United States v. Parks*, 21-cr-00363 (24 months' probation); *United States v. Nelson, et. al.*, 21-cr-00344 (24 months' probation each); *United States v. Mariotto*, 21-cr-00094 (36 months' probation); *United States v. Edwards*, 21-cr-00366 (12 months' probation), *United States v. Wangler et. al.,* 21-cr-00365 (24 months' probation for each); *United States v. Hatley*, 21-cr-0098 (36 months' probation);

[36]     *See United States v. Bustle*, *et. al,* 21-cr-238 (60 and 30 days home detention); *United States v. Andrew Bennett*, 21-cr-00227 (3 months' home detention); *United States v. Brittany Dillon*, 21-cr-00360 (2 months' home detention); *United States v. Cindy Fitchett & Douglas Sweet & Terry Brown*, 21-cr-00041 (1 month home detention each); *United States v. Caleb Jones*, 21-cr-00321 (2 months' home detention); *United States v. Jack Griffith & Eric Torrens*, 21-cr-204 (90 days' home detention each); *United States v. Leonard Gruppo*, 21-cr-00391 (90 days' home detention); *United States v. Glenn Croy*, 21-cr-00162 (90 days' home detention) and 14 days in CCF); *United States v. Jordon Stotts*, 21-cr-00272 (60 days' home detention); *United States v. Rasha Abual-Ragheb*, 21-cr-00043 (60 days' home detention); *United States v. Israel Tutrow*, 21-cr-000310 (2 months' home detention); *United States v. Nicholas Reimler*, 21-cr-239 (1 month home detention); *United States v. Gary Wickersham*, 21-cr-606 (3 months' home detention).

[37]     The government's table submitted as ECF No. 30-2 fails to list the cases where the government asked for home detention or probation, and similarly fails to distinguish between class A misdemeanors, class B misdemeanors, and/or felony level offenses of conviction.

imposed incarceration in every January 6 case, regardless of the governments' requests.[38]

Another two individuals were detained prior to their sentencings, effectively earning them a

time-served disposition and zeroing out their statutorily allowed maximum.[39]   Five defendants

had significant prior criminal history.[40]   And the other nine defendants who received

incarceration participated in truly aggravating circumstances.[41]

---

[38]      The Honorable Tanya S. Chutkan has imposed incarceration in every January 6 case sentencing to date.   *See United States v. Dona Sue Bissey*, 21-cr-00165; *United States v. Matthew Mazzocco*, 21-cr-00054; *United States v. Edward Hemenway*, 21-cr-00049; *United States v. Robert Bauer*, 21-cr-00049; *United States v. Miller, et. al.* 21-cr-266.

[39]      *See United States v. Michael Curzio*, 21-cr-00041 (time-served); *United States v. Karl Dresch*, 21-cr-00071 (time-served).

[40]      *See United States v. Erik Rau*, 21-cr-00467 (on probation at the time for domestic violence); U*nited States v. Boyd Camper*, 21-cr-00325 (prior convictions for Lewd Acts in Public and Inflicting Corporal Injury on Spouse); *United States v. David Mish* (19 prior criminal convictions); *United States v. John Lolos*, 21-cr-00243 (previously convicted of criminal harassment and removed from commercial airplane after the riot for chanting "Trump 2020" and disturbing other passengers); *United States v. Mark Simon*, 21-cr-00067 (lengthy criminal history and was on probation/release at the time).

[41]      *See United States v. Derek Jancart* and *Erik Rau*, 21-cr-00467 (defendants donned gloves, gas masks, and two-way radios upon their entrance to the Capitol; Mr. Jancart heckled police officers; Mr. Rau was on probation for domestic violence at the time); *United States v. Robert Reeder*, 21-cr-00166 (breached the Capitol twice, videotaped an officer being assaulted, bragged that he "battle[d] the police."); *United States v. Jennifer Ryan*, 21-cr-00050 (promoted others to commit violence, had forewarning that the protest would turn violent, publicly expressed a lack of remorse, and spread disinformation about January 6 in her capacity as a social-media influencer); *United States v. Boyd Camper*, 21-cr-00325 (brought his son to the Capitol, concealed video and audio evidence, and made statements to the media indicating lack of remorse and suggesting future violence); *United States v. Bradley Ruckstales*, 21-cr-00041 (defendant hurled a chair in the direction of officers and it took three officers to arrest him because of his refusal to get off the ground); *United States v. Frank Scavo*, 21-cr-00254 (defendant entered the Capitol at the Rotunda Doors, one of the most violent breaches and was personal witness to the violence at that breach.); *United States v. Russell Peterson*, 21-cr-00309 (defendant personally witnessed violence, bragged about his involvement on Facebook, and showed a lack of remorse); *United States v. Jeremy Sorvisto*, 21-cr-000320 (defendant bragged about his involvement on social media, destroyed his jacket and cell phone as evidence, and did not come forward to law enforcement when his co-defendant was arrested); *United States v.*

Further, this Court has itself sentenced two January 6 defendants on the petty misdemeanor charge, making thoughtful distinctions in both cases.  In *United States v. Jordan Stotts*, Crim. No. 21-cr-00272, in support of its request of 45 days of incarceration, the government listed seemingly ad-hoc factors, meant to aid the Court in concluding Mr. Stott's actions demanded incarceration, including that Mr. Stotts,

> (1) [] stood face-to-face with and shouted at Metropolitan Police Department officers while they were pushing back rioters, including the defendant at least three times, out of the Capitol Rotunda; (2) he scaled the wall on the Upper West Terrace to gain access to the Capitol, and once inside he raised his fist in support of those who breached the Capitol Building; (3) his post-riot statements on Facebook, in which he boasted about the "siege," claimed the fight was "far from over," and exclaimed, "I'll be back," reveal a total lack of remorse; and (4) those statements suggest that Defendant might engage in similar unlawful conduct in the future.[42]

Additionally, the government explained that Mr. Stotts spent more than an hour inside the Capitol, that in his pre-arrest interview with the FBI he "expressed his belief [] that his conduct and the conduct of other rioters was justified", and listed his past criminal convictions as proof of his "disrespect for the criminal justice system."[43]  However, this Court was not convinced that a custodial sentence was merited for Mr. Stotts, instead choosing to sentence him to 24  months' of probation with 60 days of home detention, 60 hours of community service, a $10 special assessment fee, and court-ordered restitution in the amount of $500.

Then, this Court sentenced Tam Dinh Pham, in Crim. No. 21-cr-00109.  In that case, the government argued for 60 days of incarceration, citing that Mr. Pham,

---

*Andrew Ericson*, 21-cr-000506 (defendant posed for photos with his feet up on the Speaker of the House's conference table with a beer, showed a lack of remorse, and failed to be fully compliant with the terms of his pretrial release); *United States v. Tam Dinh Pham*, 21-cr-00109 (defendant was an active police officer in Houston, Texas and downplayed his involvement when questioned by the FBI).

[42]     *United States v. Jordon Stotts*, 21-cr-00272, ECF No. 24.

[43]     *Id*.

(1) [] saw people trying to incite the police during the riot; (2) he walked past knocked-down fences and other barricades to make his way inside the U.S. Capitol; (3) while entering the Capitol, amid shouts of "It's our house now," he cheered, "We're taking the house back!, demonstrating he was not a mere "tourist"; (4) he spent approximately 20 minutes roaming throughout the Capitol building, demonstrating he did not quickly abandon the unlawful trespass; (5) he penetrated the U.S. Capitol all the way to an area of offices, thereby increasing the risk that he would encounter persons who were lawfully inside the building, including Congressional staffers, which could have escalated into a confrontation; (6) he falsely downplayed his conduct to FBI agents by claiming that he just wanted to take pictures of the artwork inside the Capitol building; and (7) as an active Houston, Texas police officer with 18 years of experience, including experience of his own responding to demonstrations, he knew full well that entering the U.S. Capitol was unlawful, and that it had a potential for serious violence.[44]

Additionally, the government explained that Mr. Pham deleted pictures on his cell phone, and noted that Mr. Pham's job "as an active-duty police officer, shows that restrictions on his behavior that did not apply to civilians were insufficient to deter him. That, coupled with his initial attempts to minimize the gravity of his conduct," created a need for 60 days of incarceration.[45]  Notwithstanding the government's request, this Court ultimately decided to incarcerate him for 45 days, finding Mr. Pham's lack of acceptance of responsibility troubling, and citing that he "added an air of legitimacy to what happened that day because [he was] a police officer."[46]

Here, however, Mr. Register is more closely aligned to Mr. Stotts than Mr. Pham, warranting a non-incarceration sentence.  Mr. Register is not an active duty police officer, whom citizens look to for guidance about law-abiding behavior.  Mr. Register also did not attempt to

---

[44]   *United States v. Tam Dinh Pham*, 21-cr-00109, ECF No. 36.

[45]   *Id*.

[46]   *See* Eric Flack, *Despite 'inspiring' immigrant story, former Houston Police officer gets 45 days in jail for Capitol riot*, WUSA9 (Dec. 10, 2021), available at https://www.wusa9.com/article/news/national/capitol-riots/houston-police-officer-tam-dinh-pham-sentenced-to-45-days-in-prison-for-capitol-riot-january-6-donald-trump/65-fca66fec-76d2-4698-bf34-ddd076fddf81.

spin a tall tale of only going into the Capitol to "take pictures of the artwork in the building", and unlike Mr. Pham, he was forthcoming about having altered his phone.  Like Mr. Stotts, Mr. Register entered the building unlawfully, and expelled enthusiasm while inside for the unlawful occupants.  However, unlike Mr. Stotts, and suggestive of a less punitive sentence, Mr. Register only spent 30 minutes inside the building instead of an hour, he did not make boasting statements on social media, did not expel disinformation about what happened on January 6, and did not scream in law enforcement's face, directly disobeying their commands.

Certainly, there are always differences in criminal cases, which may result in disparate sentencing.  However, the differences between Mr. Register's conduct and others sentenced to probation or home detention are minimal at best; this Court need not be swayed by the government's evolving sentencing requests.  Again, Mr. Register did not destroy any property, or brag about his involvement on social media.  He has no real substantive criminal history and has expressed full remorse for his participation.  Though he did factory re-set his cell phone in fear, he was honest and upfront about that to agents when they interviewed him and he gave his consent for the phone contents to be searched.  He waved for others to come over to a different part of the corridor but had no idea where that corridor led, and had no foresight that Ashli Babbitt, having made her way to the hallway without Mr. Register's direction, would attempt to jump through the window and be ultimately struck down by a bullet.

Mr. Register was not previously detained prior to sentencing, has only a minimal traffic conviction from eight years ago, and was completely non-violent and non-destructive in his offense.  Further, Mr. Register has been fully, "exceptionally" compliant while on pretrial release, has worked hard to re-gain employment lost as a result of this case, and enjoys the love and support of a healthy, happy family unit.  Simply put, on these facts, sentencing Mr. Register

to any term of incarceration, much less five months, would result in an unwarranted sentencing disparity, both within the District and with the cases already sentenced before this Court.

### IV.     Mr. Register's Ability to Pay Restitution is Directly Related to His Ability to Work

Finally, 18 U.S.C. § 3553(a)(7), provides that a Court must account for whether a proposed sentence would impact the ability of the defendant to provide restitution to the victim of the offense.  As part of his plea agreement, Mr. Register has agreed to pay $500 to the Architect of the Capitol, even though he was not personally responsible for any damage to the building.  Agreeing to that amount of money is a significant commitment for Mr. Register since, because of this case, he was unemployed for months and is just now starting to recover financially.  Additionally, his vocation, truck-driving, is not a job that may be done remotely, and because he is paid by the hour and is not salaried, taking a leave of absence means he will not be compensated.  Additionally, his job has made clear to him that if he is incarcerated for more than a month, it will be forced to terminate him, which would unnecessarily delay his ability to make timely restitution payments, and will not serve the interests of the victim in this case since according to the government, $1.4 million has already been expended to repair damage done on January 6.

### Conclusion

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Register, despite his presence within the crowd and in the building, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered.  He did not organize or incite the riot, nor did he physically harm any person or property.  And though Mr. Register certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and

characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to timely pay restitution.  While the Court must certainly consider the need to deter future defendants from engaging in similar conduct, the Honorable Nichols was correct when he stated, during a similar January 6 sentencing that,

> It is unlikely that the circumstances that led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crowd, to protest and demonstrate, even fight at the Capitol . . . I would just note that I agree with several other judges of this court that probation without anything more should not be the default, but that does not mean it isn't an appropriate outcome in appropriate cases.[47]

Here, in Mr. Register's case, after considering all the factors mentioned above and other considerations under 18 U.S.C. § 3553(a), a probationary sentence, restitution in the amount of $500, and community service, is an appropriate outcome.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org

---

[47]     *See* Transcript of Video Plea Agreement/Status Conference in *United States v. Douglas Sweet*, 21-cr-00041-3, ECF No. __ at 45-47.