IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00349-TJK-1

v.                                Washington, D.C.
                                  Thursday, February 24, 2022
JEFFREY REGISTER,                 2:00 p.m.
            Defendant.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:    William K. Dreher, Esq.
                          U.S. ATTORNEY'S OFFICE
                          700 Stewart Street
                          Suite 5220
                          Seattle, WA 98101
                          (202) 553-4579


For the Defendant:        Cara K. Halverson, Esq.
                          FEDERAL PUBLIC DEFENDER
                          625 Indiana Ave, NW
                          Suite 550
                          Washington, DC 20004
                          (202) 208-7500


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Criminal

3    Matter 21-349, United States of America v. Jeffrey Register.

4                   Present for the Government is William Dreher;

5    present from the United States Probation Office appearing by

6    Zoom is Kelli Willett; present for the defendant is Cara

7    Halverson; also present is the defendant, Mr. Register.

8              THE COURT:  All right.  Well, good afternoon --

9    actually, hmm.  Ms. Harris, I'm not getting -- test, test.

10             (Brief pause.)

11             Oh, there we go.  There was -- I had the

12   technological savvy to actually figure it out which is a

13   minor miracle.

14             THE DEPUTY CLERK:  Someone's been tinkering with

15   your stuff.

16             THE COURT:  Pardon me?

17             THE DEPUTY CLERK:  I said someone's been tinkering

18   with your stuff.

19             THE COURT:  Yeah, the judge mic was muted.

20             THE DEPUTY CLERK:  Okay.

21             THE COURT:  In any event, good afternoon,

22   everyone.

23             We are here for the sentencing of Mr. Register,

24   who has pled guilty to Count 4 of the information charging

25   him with parading, demonstrating, or picketing in a Capitol

1    building, in violation of Title 40 United States Code

2    Section 5104(e)(2)(G).

3           I have received and reviewed the presentence

4    report and the sentencing recommendation from the Probation

5    Office -- thank you, Ms. Willett -- and the sentencing

6    memoranda from the Government and the defendant.  Are there

7    any other -- I guess I should also add, I have also the

8    stipulation that the Government filed and may enter into

9    this proceeding.  Other than that, are there any other --

10   and, of course, I've received the video exhibits that the

11   Government proffered, as well.

12          Are there any other documents or materials for me

13   to review, Mr. Dreher?

14          MR. DREHER:  I believe, Your Honor, you likely

15   also have Exhibit-A to the Government's sentencing

16   memorandum which is technically a 302 -- an FBI 302 --

17          THE COURT:  Correct.  I do have that, as well.

18          MR. DREHER:  That's it from the Government.

19          THE COURT:  All right.  Ms. Halverson, anything

20   further for me to review?

21          MS. HALVERSON:  Your Honor, you did receive the

22   personal character letters in regards to Mr. Register, as

23   well?

24          THE COURT:  Correct, and including one that is

25   under seal --

```
1            MS. HALVERSON:  Correct.  Yes.

2            THE COURT:  So -- and, of course, I have all of

3    those.

4            And let me make one other statement while we are

5    here.  What -- are -- Ms. Halverson, are you vaccinated for

6    COVID-19?

7            MS. HALVERSON:  I am, Your Honor.

8            THE COURT:  All right.  And, Mr. Dreher, are you

9    vaccinated?

10           MR. DREHER:  (Indicates affirmatively.)

11           THE COURT:  All right.  I see thumbs-up.

12           MR. DREHER:  I am.

13           THE COURT:  All right.  So I don't have any

14   problem with either of you, whether you're going to be

15   addressing me where you are sitting, with taking off your

16   mask when you're -- particularly when you're speaking, but

17   if -- and also, particularly if you come up to this podium,

18   that's fine, as well.

19           My understanding from the presentence report is

20   that Mr. Register is not vaccinated; is that correct?

21           MS. HALVERSON:  That is correct.

22           THE COURT:  All right.  So that is why -- and I

23   don't know if Ms. Harris mentioned this at all -- but that

24   is why we set up the podium where it is.  So he will -- if

25   he chooses to address me, he should remove his mask, because
```

1    I do want to see his face, but he'll do so from there which

2    will give a little bit of an extra buffer between himself

3    and the court personnel and me.

4            All right.  Mr. Register, this sentencing hearing

5    is going to proceed in four steps, and all the while, I want

6    you to make -- I want you to keep in mind the seriousness of

7    why we are here.  You committed and pled guilty to a federal

8    crime, and today's proceeding is about the consequences

9    you'll face as a result of your decision to commit that

10   crime.

11           The first step of today's hearing is for me to

12   determine whether you and your counsel have reviewed the

13   presentence report and whether there are any outstanding

14   objections to that report and, if so, to resolve those

15   objections.

16           The second step is usually for me to determine

17   what sentencing guidelines and sentencing range applies in

18   your case based on your criminal history and considering any

19   aggravating or mitigating factors that may warrant a

20   departure under the sentencing guidelines manual, but

21   because you have pled to a misdemeanor, a particular type of

22   misdemeanor also, the sentencing guidelines do not apply in

23   this case, but even so, I'll take that opportunity to

24   clarify the sentencing framework we're operating under, what

25   the maximum sentence is, what the -- and with regard to

1    incarceration or any other consequences of a conviction.

2           The third step is for me to hear from you, your

3    lawyer, and the Government counsel in -- and from you if you

4    wish to be heard -- about sentencing in this case.

5           And the last step is -- requires me to fashion a

6    just and fair sentence in light of the Congress -- the

7    factors that Congress has set forth in statute in 18 United

8    States Code 3553(a), and as part of that last step, I will

9    actually impose the sentence along with the other required

10    consequences of the offense.

11           So moving to step one, the final presentence

12    report and sentencing recommendation were filed in this

13    matter on February 15th, 2022.

14           Mr. Dreher, does the Government have any objection

15    to any of the factual determinations set forth in the

16    presentence report?

17           MR. DREHER:  No, Your Honor.

18           THE COURT:  All right.  Ms. -- and then I'll turn

19    to Ms. Halverson.  Have you and your client read and

20    discussed the presentence report?

21           MS. HALVERSON:  We have, Your Honor.

22           THE COURT:  And do you have any objection to any

23    of the factual statements set forth in the report?

24           MS. HALVERSON:  With the addition of the

25    qualifications made in Paragraph 19 on Page 6 of the report

1    which talks about a 302 being in dispute between the

2    parties, we have no other objections to the presentence

3    investigation report.

4              THE COURT:  All right.  But you do -- you do want

5    to -- let me just look at the exact paragraph you're talking

6    about.  Is it -- yeah, there we go.  The allegations --

7    right.  So it does -- the report does say that you disagree

8    about the statements in Paragraph 22.  I guess the question

9    is -- so are the parties going to put on evidence about this

10   and have me determine whether Mr. Register made those

11   statements through evidence you plan on putting on or do you

12   -- are you planning -- are the parties simply planning on

13   arguing to me that he did not say it for one reason or

14   another?

15             MS. HALVERSON:  Your Honor, I think part of -- and

16   I don't know if I should stand or not stand.  What do you

17   prefer?

18             THE COURT:  You can sit.  That's fine.

19             MS. HALVERSON:  Okay.

20             THE COURT:  All right.

21             MS. HALVERSON:  I'm not used to being at this

22   seat -- at the table here.

23             So I think the point of the stipulation that was

24   entered in this case was to, sort of, remove the evidence

25   fact-finding part of that inquiry.  I think we're firmly on

1    the grounds with these facts of agree to disagree, and so I

2    had not intended to put on evidence one way or the other or

3    really address it.  I think it's important for the Court to

4    know that it's out there and that is a fact that's in

5    dispute, but I don't know what the Government's plan is as

6    far as their -- if they want to be putting on evidence.

7           THE COURT:  Well, presumably -- I mean, they went

8    through the trouble of proffering a -- the parties agreed on

9    a stipulation.  So I assumed that was in lieu of putting

10    on -- an agent on the stand and I assumed the parties had

11    agreed on that.  I suppose it's not something -- the --

12    since the guidelines here don't apply, it's not something I

13    have to, maybe, resolve at this stage because it doesn't --

14    the question of whether he said this -- these words or not

15    or whether they're taken out of context or whatever the case

16    may be doesn't affect his guideline calculation because

17    there is no guideline calculation.  So that's fine.  And if

18    you all want to just say, Okay, you know -- I have that

19    stipulation, I've received it, and I'm not, you know -- you

20    can proceed however you want, Ms. Halverson, whether you

21    want Mr. Register, at some point, to be sworn and to swear

22    to something other than that or you just want to argue to

23    me, for whatever reason, they -- this was taken out of

24    context -- or he did say those things but not exactly in

25    that way; it was taken out of context, whatever, but I take,

1    then -- I think what we've arrived at here is that, number

2    one, I -- at this stage in our proceeding, there's no reason

3    for me to resolve this fact that may be disputed but really

4    isn't anything pertinent to the guidelines, and then you all

5    will just argue to me -- I have the stipulation, and you all

6    will argue to me one way or the other what I should make of

7    all this; is that fair?

8             MS. HALVERSON:  That was my understanding, Your

9    Honor.

10            THE COURT:  All right.

11            MR. DREHER:  Your Honor, I think your instinct is

12   correct that when we obtained the stipulation, it was in

13   lieu of us actually presenting agent testimony which is what

14   we would have done.  I think the Government's position is

15   certainly that based on that stipulated testimony, in the

16   absence of any countervailing evidence, you know, it would

17   be more than sufficient evidence before the Court, as in any

18   sort of trial where there's stipulated testimony, for the

19   Court to resolve that factual dispute, but I do agree that

20   if the Court does not think resolving that factual dispute

21   is necessary to its sentence in this case, then it does not

22   need to do that.

23            THE COURT:  Well, I don't -- I think it's not

24   necessary, you know -- typically, when we're going through

25   the presentence report, it's usually -- the question of

1    whether there's a factual dispute usually links up in some

2    way to the guideline calculation.  Now, I do think it could

3    be -- I mean, depending on what Ms. Halverson, I suppose,

4    argues, if the argument is -- but -- let me back up -- but I

5    do think that it might be relevant to my sentence as opposed

6    to my -- the guideline calculation which doesn't exist here.

7    So I do think I'm going to end up resolving that question

8    one way or the other, and I'm going to have the stipulation

9    and I'm going to have Ms. Halverson's argument and I'm going

10   to have to resolve it, I think, unless -- again, I'll wait

11   to hear Ms. Halverson address it.  We're really, kind of,

12   talking about something a little more mushy and whether it

13   was, you know -- this was, sort of, taken out of context as

14   opposed to it was never said.  Let's put it that way.  But

15   if there truly is a direct factual dispute, you're right.  I

16   could decide it doesn't matter, but if I think it might

17   matter, I think I do need to resolve it, but I guess my

18   point is I can resolve it after hearing you argue this, I

19   think, down the line, and I see both heads nodding and I

20   think that's what I'm going to do, then.

21             All right.  Very well.  So with that factual

22   dispute, sort of, noted and, sort of, with the -- with

23   everyone understanding we're going to come back to that,

24   with that, then, stipulation, I guess, what I'll go ahead

25   and do is just -- well, let me inquire, then, of

1    Mr. Register before we move further.

2            Mr. Register, have you had enough time to talk

3    with your attorney about the presentence report and the

4    papers the Government filed in connection with this

5    sentencing?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  And are you fully satisfied with

8    Ms. Halverson as your attorney in this case?

9            THE DEFENDANT:  One hundred percent.

10            THE COURT:  All right, then.  I will accept --

11    with the caveat about Paragraph 22, I believe it was, I will

12    accept, other than that, the facts as stated in the

13    presentence report and the presentence report will be my

14    findings of fact for the purpose of this sentencing with the

15    caveat that we're going to have to -- I will make a factual

16    determination regarding these outstanding matters once the

17    parties have an opportunity to address them.

18            Next, we would go to step two which would

19    ordinarily be the determination of the guidelines.  The

20    presentence report lays out the statutory sentencing

21    framework that applies in this case.  So let me go ahead and

22    attempt to summarize it.

23            As far as a statutory maximum goes, first, as a

24    preliminary matter, Congress has imposed a statutory maximum

25    sentence for the offense to which Mr. Register has pled

 1    guilty.  The statutory maximum is six months.  As far as

 2    supervised release goes, supervised release is not

 3    applicable under 18 United States Code Sections 19 and

 4    3583(b)(3).  As far as probation goes, the defendant is

 5    eligible for up to five years of probation because the

 6    offense is a misdemeanor.  That's under 18 United States

 7    Code Section 3562 -- 61(c)(2).  And as far as a fine goes,

 8    the maximum fine for this offense is $5,000.  There's also a

 9    special -- mandatory special assessment of $10 under 18

10    United States Code Section 3013(a).

11            So let me ask both counsel whether I've accurately

12    stated the statutory framework on which we are operating in

13    regard to this case.

14            Mr. Dreher?

15            MR. DREHER:  I believe so.  Yes, Your Honor.

16            THE COURT:  Ms. Halverson?

17            MS. HALVERSON:  Yes, Your Honor.  The only

18    question I have for Your Honor about the statutory framework

19    is whether or not this Court has reached a decision about

20    whether or not, if active incarceration is imposed, that

21    probation is also lawful under the statutes.

22            THE COURT:  So I think -- the answer to that

23    question is I haven't had the -- I haven't had a reason to

24    make that decision yet, and I think I'm going to leave aside

25    that question for the moment and see if, in this case, I

1    feel like I need to answer it.

2            MS. HALVERSON:  Fair enough, Your Honor.  Thank

3    you.

4            THE COURT:  All right.  Very well.

5            All right.  Next, we move to, really, what is the

6    heart of the matter in a case like this -- a misdemeanor

7    case -- is consideration of the statutory factors under 18

8    United States Code 3553(a) and the opportunity of the

9    defendant to speak if he so chooses.

10            I have to now consider the relevant factors that

11    Congress set out in 18 United States Code Section 3553(a),

12    and if the defendant would like to speak, he may, and I must

13    ensure that I impose a sentence that is sufficient but not

14    greater than necessary to comply with the purposes of

15    sentencing.  These purposes include the need for the

16    sentence imposed to reflect the seriousness of the offense,

17    to promote respect for the law, and to provide just

18    punishment for the offense, and the sentence should also

19    afford adequate deterrence to criminal conduct, protect the

20    public from future crimes of the defendant, and promote

21    rehabilitation.  And I must consider the nature and

22    circumstances of the offense; the history and

23    characteristics of the defendant; the need for the sentence

24    imposed to comply with the purposes I just mentioned; the

25    kinds of sentences available; the need to avoid unwanted

1    sentence disparities among defendants with similar records

2    who have been found guilty of similar conduct; and the need

3    to provide restitution to victims of the offense.

4             So I will hear the Government now on application

5    of the 3553(a) factors as well as -- I think, just make it

6    easier -- as well as this disputed issue of fact about

7    whether the defendant made the statements that are in

8    dispute.  And you may do it from there if you'd like,

9    Mr. Dreher, or you may come all the way up here.  That's --

10   either way is fine with me.

11            I'll -- and let me just -- before I hear from you

12   and from Ms. Halverson, let me give you all a little preview

13   of, kind of, where I'm at on this so you can, kind of,

14   direct your thoughts accordingly.

15            On the one hand, I will say, part of what the

16   parties in this case are arguing about as far as a sentence

17   goes is whether -- the question of whether a custodial

18   sentence is appropriate.  And I will say, I've -- and part

19   of the answer to that is what is unique about this case --

20   maybe, not unique -- but what takes this case perhaps --

21   what are the aggravating factors -- let's put it that way --

22   here?  And part of it is an argument about what other judges

23   have done in other cases.  I would say I have -- I am -- I

24   was going to say impressed, but impressed is not really the

25   right word -- I am struck by three factors here that I think

 1    do make this case a little bit different, certainly, in

 2    combination, but I think the first one -- different than a

 3    lot of cases that I've educated myself on in connection with

 4    this proceeding and that do, to me, collectively suggest

 5    that a custodial sentence is warranted and, at a minimum,

 6    certainly, when I look at other sentences other judges have

 7    meted out, don't -- that I think it's fair to say that a

 8    custodial sentence in this case would not be outside what

 9    other judges have done.

10          Those three factors are, first, that the

11    defendant, in the moment that he began waving the mob in a

12    direction, took a -- I mean, for that moment, he was

13    directing the mob.  I haven't seen another misdemeanor

14    case -- put felonies aside.  I didn't even look at those to

15    the extent they were even in the parties' sentencing

16    submissions.  I don't think I see a case out there so far in

17    which a defendant has been -- which any misdemeanor

18    defendant has been sentenced for conduct that could

19    plausibly be described as directing or leading the mob.

20    Now, I get there are -- within that, there are mitigating

21    factors, but I don't -- I didn't see a case like that.

22    That's number one.

23          Number two, I have -- is -- are the disputed

24    statements.  And I think, again, we'll see what --

25    Ms. Halverson, what your argument is on this exactly about

1    whether they're truly disputed or what aspects of them are

2    disputed, but we have a situation where at least the

3    proffered statement is that the defendant knew that what --

4    he was intending to get as close to the House chamber as

5    possible and that -- I'm paraphrasing now -- and that he was

6    doing so because he wanted to affect the proceeding.  Maybe

7    for a lot of people who showed up at the Capitol that day,

8    that may have been what they intended.  It's hard to know

9    exactly.  But here, we have at least the proffered statement

10   as very clear evidence that that was what the defendant was

11   intending to do as opposed to, sort of, milling around and

12   holding up a sign and protesting.  That's number two.

13          And number three is the fact that the defendant

14   did destroy potentially relevant evidence on his cell phone.

15   Again, now, I have -- there are cases of that, for sure,

16   and, you know, judges have come out -- I've looked at enough

17   cases to prepare for this that I know that largely -- that

18   as a general matter, that's -- that has come up in a bunch

19   of cases where defendants have -- I can think of a few where

20   defendants have been sentenced to a custodial sentence and

21   others where they have not -- I think, others where they

22   have not.  I'm not sure about that.

23          But in any event, look, these are very

24   fact-intensive, fact- -- determinations, and I'm not

25   suggesting any one thing is determinative, but those three

1    things in combination and then particularly the first thing,

2    I guess, in isolation -- the first element -- I think, do

3    make this different and, certainly, as I looked at the

4    sentences judges have meted out, I don't think a custodial

5    sentence would be out of step with what other judges have

6    done.  There are, of course, outliers in both directions,

7    but generally speaking.  That's, I guess, the first thing

8    I'll say on that.

9         On the other hand, the sentence the Government is

10   asking for here -- the five months -- would be a quantum

11   step above any sentence that a judge -- again, we're talking

12   about misdemeanors here -- a quantum leap above any sentence

13   that any judge has meted out, I think, for a misdemeanor.

14   The Government has asked for three months, four months on

15   occasion in a few isolated cases, and in some of them --

16   those judges have done different things in those cases.

17   Sometimes a custodial sentence, sometimes not.  But it is a

18   quantum leap up in request and certainly would be a quantum

19   leap up in actually a sentence imposed if I were to impose

20   it.

21         So you know, my instinct, again, from looking and

22   seeing what other judges have done; from looking at how I

23   view the importance of these aggravating factors, we're

24   going to call them; and then balancing that out against the

25   positive things about Mr. Register, you know, that were part

```
 1   of the defense submission, I think it feels, you know -- I
 2   think the Government's going to have some convincing to do
 3   for me that this case is so far above what has been -- the
 4   sentences that have been meted out here; that the defendant
 5   is that much more culpable that we're talking about a
 6   sentence -- I think that -- I can't -- I think the longest
 7   sentence a judge has given on a misdemeanor case, other than
 8   cases where folks had served six months already and it was a
 9   sentence of time served -- putting that -- those cases
10   aside -- I think, is three months or so, and I think even
11   that case was, sort of, an outlier.
12            So anyway, that's, kind of, where I am, just to
13   give you all that ahead of time because I think it's
14   helpful.  You can, kind of, direct your arguments
15   accordingly.  With -- I'll stop talking now and hear from
16   the Government.
17            MR. DREHER:  Thank you, Your Honor.
18            Just as an initial matter, the Government does
19   move to dismiss the remaining counts in the information.
20   And we would move to admit the exhibits as well as, I
21   suppose, the stipulation that the Court already has.
22   Obviously, normally, that would, sort of, just be --
23            THE COURT:  So any --
24            MR. DREHER:  Go ahead.
25            THE COURT:  Any objection to me admitting the
```

```
 1    stipulation, Ms. Halverson?
 2              MS. HALVERSON:  No objection.
 3              THE COURT:  All right.  And I'm assuming no
 4    objection to the dismissal of the remaining counts.
 5              MS. HALVERSON:  No objection to that.  Thank you.
 6              THE COURT:  All right.  So the remaining counts
 7    will be dismissed and the stipulation will be admitted with
 8    no objection.
 9              MR. DREHER:  And I think we would also move to
10    admit the video exhibits that are part of this.  I would
11    move to admit Exhibit-A which is the 302, but I understand,
12    obviously, the defense, you know, preserves essentially its
13    objection to that portion of the 302 that describes
14    Mr. Register's --
15              THE COURT:  Well, you could move to admit it with
16    that understanding that there is an outstanding objection to
17    those particular passages.  Let's put it --
18              MR. DREHER:  And --
19              THE COURT:  -- that way.
20              MR. DREHER:  -- at sentencing, in any event, I
21    think we do that typically just to make, sort of, the record
22    extremely clear that --
23              THE COURT:  Right.
24              MR. DREHER:  -- that has been considered by the --
25              THE COURT:  Understood.
```

 1              Ms. Halverson, any objection to any of that?

 2              MS. HALVERSON:  No, Your Honor.

 3              THE COURT:  All right.  So that -- the video

 4      exhibits, of course, will be admitted and the 302 will be

 5      admitted subject to, of course, Ms. Halverson's argument

 6      that certain statements within that were -- subject to her

 7      objection to those statements which I'm going to hear from

 8      her about.

 9              MR. DREHER:  Thank you, Your Honor.

10              I'm not going to -- I'm going to start not with

11      January 6th for the moment but, instead, with something that

12      happened to Mr. Register nine years ago, part of his

13      criminal history.  In 2013, Mr. Register gets arrested for a

14      DUI, pleads it down to reckless driving, and he gets

15      probation.  The next year, he's caught driving with a

16      suspended license, violated his probation, and he gets 10

17      days in jail for the probation violation and then another 5

18      just for driving with a suspended license.

19              Now, in his submission, Mr. Register called these

20      minor traffic infractions.  I'm not sure I would agree with

21      respect to the DUI, but I will agree that driving with a

22      suspended license, standing alone, does not endanger anyone

23      necessarily.  It's the same thing he does every time he

24      drives a car.  It's just a status offense.  And yet, for

25      that, he went to jail for two weeks.  And that happens all

1    the time in America.  People go to jail for small offenses

2    like unpaid court fines, possession of small amounts of

3    drugs, things like that.  And I think that this case is, in

4    part, about the contrast between offenses like that which

5    might be misdemeanor offenses and the conduct -- the offense

6    -- the nature of the offense here.  Contrast that kind of

7    offense with what Mr. Register did on January 6th, broke

8    into the Capitol building while Congress is in session.  He

9    refused officers' instructions to leave.  He sprints around

10   lines of officers that are --

11           THE COURT:  Can --

12           MR. DREHER:  -- trying to --

13           THE COURT:  Can I just stop you right -- I --

14           MR. DREHER:  Of course.

15           THE COURT:  -- hate to do this, but I just -- when

16   I have something -- I'm going to do it.  Mr. Dreher, I --

17   the Government does make a big deal about him not obeying

18   officers at various points in time.  I -- how is that really

19   -- I mean, isn't every single person who really went in

20   there -- into the Capitol that day -- aren't -- isn't that

21   -- that doesn't distinguish him, does it?  I mean, I take

22   your point, and there may be defendants who show up and try

23   to say, Well, I thought it was perfectly fine, but I

24   generally won't believe those defendants when they do, and I

25   don't know that that piece really distinguishes him from

 1    every single person who's going to come in and answer for

 2    that -- what they did that day.  Is that fair?

 3              MR. DREHER:  I think it's -- it certainly doesn't

 4    distinguish him from the --

 5              THE COURT:  Okay.

 6              MR. DREHER:  -- vast majority of defendants.

 7    Probably, there are some folks who came in later than

 8    Mr. Register --

 9              THE COURT:  Right.

10              MR. DREHER:  -- did, right, who might not --

11              THE COURT:  Right.

12              MR. DREHER:  -- have encountered --

13              THE COURT:  Sure.

14              MR. DREHER:  -- law enforcement, but --

15              THE COURT:  Okay.

16              MR. DREHER:  -- I agree.  That's just, you know --

17              THE COURT:  Okay.

18              MR. DREHER:  -- sort of, one clause.  I do think

19    I'll -- as I'll explain later, I think it's relevant to one

20    thing.

21              And, of course, Mr. Register, then, joins this mob

22    which as it, you know -- as Exhibit-B shows, this mob is

23    standing outside the doors to the House chamber, a pretty

24    impressive place.  That's where the President walks through,

25    you know, en route to the State of the Union address.  And

```
 1    they're chanting, Break it down.  Break it down.  People are
 2    passing up sticks to try to, you know, get their way in.
 3    And inside the House chamber, members of Congress are lying
 4    on the floor.  Some of them are putting gas masks on.  The
 5    Capitol Police have drawn their weapons because they're
 6    ready to shoot and potentially kill rioters who break
 7    through those doors; right?  And at that crucial moment when
 8    they're stymied at those doors, they can't get in,
 9    Mr. Register finds himself, you know, 40, 50 yards down the
10    hallway; sees other people; starts shouting, Hey, come this
11    way, come this way.  Or I just have to assume that.  I can't
12    hear it on the --
13              THE COURT:  Right.
14              MR. DREHER:  -- CCTV.  And he energetically and
15    enthusiastically -- that's the only way I can describe it --
16    joins in that.  In fact, I think, runs down closer to the
17    crowd to be like, In case you haven't heard, come this way;
18    right?
19              THE COURT:  Mm-hmm.
20              MR. DREHER:  He waves them around to a separate
21    entrance where there is -- I mean, just as an indication of
22    the -- both the threat that was perceived, but also how
23    hastily the Capitol Police had to defend these breach
24    points, there's literally furniture, right -- I mean, tables
25    and chairs -- that had been piled up at the Speaker's Lobby
```

1    entrance.  And there are only four officers, less well

2    defended.  And when the mob arrives, they can see through --

3    this is on open-source video, and Mr. Register actually

4    admitted this in his interview -- they could see members of

5    Congress literally fleeing down a staircase at the end of

6    that hallway.

7              THE COURT:  Who they thought were members of

8    Congress.

9              MR. DREHER:  Yes.

10             And the mob ends up punching the glass -- and

11   members of this mob ended up punching the glass, obviously,

12   breaking their way through, and while this is happening,

13   Mr. Register is standing there with them; right?  I mean,

14   10, 12 feet back, clearly willing to go into the mob -- with

15   that mob into the chamber.  And it wasn't until the Capitol

16   Police did deploy deadly force and actually shot and killed

17   someone that Mr. Register left the building, but that wasn't

18   it.  He then went -- first of all, he stayed on Capitol

19   grounds for another hour.  So this was not some, like, sort

20   of, religious conversion that convinced him that what he had

21   done was wrong, but then he went home and factory reset his

22   phone and then lied to the FBI twice to their faces when

23   they came and asked him whether he had gone inside the

24   Capitol, and he only admitted that he had gone inside the

25   third time when the FBI said, It's really important that you

1    be honest, which any reasonable person in his shoes, if

2    you've denied culpability twice and the FBI reaches out and

3    says, You really have to be honest with us, Mr. Register,

4    everyone knows that that means -- or I should say most

5    reasonable people would suspect the FBI already knows that

6    you were inside.  So there shouldn't be much credit given

7    for admitting it at that point.

8                Now, for all of that misconduct, Mr. Register

9    thinks he should get less jail time than he did for driving

10   with a suspended license eight or nine years ago, and the

11   Government finds that comparison somewhat astonishing, but I

12   think that it underscores the way in which sometimes these

13   cases are perceived by the people who need to be deterred.

14   In this case, it's Mr. Register, because that's his own

15   criminal history; right?  That's what he knows about the

16   criminal justice system.  At -- but it also speaks to

17   general deterrence, members of the public who might see

18   folks go into custody for short periods of time for things

19   that, frankly, probably seem trivial relative to this

20   conduct.

21               Now, at the end of this, I'm going to give the

22   Court, I think, four ways to think about the sentence in

23   this case, all of which, I think, lead to the only

24   conclusion -- the only reasonable conclusion being a

25   sentence of at least -- I should say, at a minimum, five

1    months, but first, to the Court's concerns, let me explain

2    in particular why his misconduct in his case is exceptional

3    relative to other misdemeanor cases.

4            Okay.  As the Court knows, we went through a lot

5    of aggravating factors for Mr. Register, but I'm just going

6    to focus on the ones both that the Court identified and that

7    we think really make him exceptional -- or rather, the

8    exception perhaps is a better word.

9            So first and most prominent, yes, in the

10   Government's view, is the fact that Mr. Register, for that

11   moment, actually led and/or directed -- helped lead the mob

12   to another location.  And I -- just to be clear, it's not

13   just that; right?  It's also, like, consequences matter, and

14   the consequences of what he did was a, you know -- was a

15   fatal confrontation between a rioter and the Capitol Police.

16           THE COURT:  True.  Let me just stop you there.

17   It's not, though, as if he was a -- like, a but-for cause of

18   that.  You would agree there; right?  I mean --

19           MR. DREHER:  I agree.

20           THE COURT:  -- there were --

21           MR. DREHER:  There were a lot of --

22           THE COURT:  -- other people -- Ms. Halverson is

23   going to step up here and say, There was someone else who

24   did it a micro- -- who waved them over a microsecond ahead.

25   It doesn't, to me -- I mean, that person could have been a

```
1   few seconds ahead; could have been a few seconds behind.

2   Either way, he did step into that role, and I'm -- I credit

3   the argument there.  And, maybe, I, you know -- how I weigh

4   what eventually happened, I think, is -- it has to play a

5   role here.  But you'd admit that if -- I mean, if everything

6   had played out exactly the same and Mr. Register wasn't

7   there, it's -- it would have played out the same -- I mean,

8   it would have -- the chances of it playing out the same way

9   would have been the same?

10              MR. DREHER:  I think that that's probably fair,

11  given what's on the CCTV.  So --

12              THE COURT:  Right.

13              MR. DREHER:  So my point was a little bit

14  different which is there may be actually other instances of

15  people waving to their friends who are in the Capitol

16  building, calling people over to check out a hallway, but it

17  turns out that the hallway that they go over to check out

18  is, like, the bathrooms or --

19              THE COURT:  Right.

20              MR. DREHER:  -- the elevators --

21              THE COURT:  Right.

22              MR. DREHER:  -- right, or they get very close to

23  an exit that they didn't want to go through.

24              THE COURT:  Right.

25              MR. DREHER:  So my point is it does matter; right?
```

1    I mean, consequences matter in the criminal law.  And --

2         THE COURT:  Agreed.

3         MR. DREHER:  -- so for Mr. Register, I think it's

4    not just that he's directing the mob, and it's not just that

5    he's helping to direct a mob that he had to have heard

6    chanting these things right outside the House chamber --

7         THE COURT:  Right.

8         MR. DREHER:  -- but it is that, you know, it led

9    the mob to this less well-defended barricade --

10        THE COURT:  Right.

11        MR. DREHER:  -- with tragic consequences.

12        THE COURT:  Right, and that -- my point is -- I

13   give you, I guess, more credit for the first part than the

14   tragic consequences which, it seems, were more contingent on

15   other things, but I take your point that if -- and, again, I

16   think the defense is going to argue, Well, he didn't know

17   that it was this undefended point.  But I don't know, you

18   know?  I mean, given -- I mean, we don't know what was in

19   Mr. Register's head at that time precisely, but the

20   excitement with which he waved people over certainly

21   suggested he thought that it was a less defended and a more

22   -- a way of getting wherever they all were trying to go.  I

23   grant you that.

24        MR. DREHER:  So one thing that I do think, though,

25   is relevant is, without saying that he's only the person

1    that waved the mob around, I actually do think when you see

2    both the CCTV and how few people there were there

3    originally -- if you were to take the class of folks, the

4    group of people who waved them all around, I do think that

5    they are -- they bear some responsibility at least for

6    eventually what occurred, and here's why.  Ms. Babbitt,

7    along with about five or six, I think, other rioters, are

8    there at the Speaker's Lobby entrance, but there are four

9    officers, one behind the barricade and three in front at the

10   Speaker's Lobby, and initially, it's a -- that's a pretty

11   manageable situation.  It -- frankly, I think it's unlikely

12   that without, sort of, the -- this crush of other people

13   coming up to embolden them, it would have been necessary to

14   use deadly force just to manage five or six rioters.  So

15   that's another way, I think, in which the group of people,

16   let's say, who called them over, I think, did create these

17   conditions that were far more dramatic and far more

18   dangerous for everyone involved.

19           But the second thing that I want to emphasize,

20   because I think it's a little bit -- it's an added twist to

21   what this Court said, is it's one thing to direct the mob,

22   but even if Mr. Register had not, he's also one of the first

23   defendants -- misdemeanor defendants to come before the

24   Court -- a court for sentencing who was even part of that

25   mob that was outside of the House chamber.  There are a

1    couple others, and I'm going to talk about one comparator

2    case a little bit later, but that alone, again, is a fairly

3    significant aggravating factor.  There are people who went

4    inside and went in the Rotunda or there are people who went

5    inside and, kind of, wandered around some hallways and find

6    their way out, and in many ways, you know, what happened at

7    the Speaker's Lobby, it's, sort of, the apex of the

8    incursion on the House side; right?  Certainly, a dangerous

9    situation.  And what the Government finds telling is he

10   waves them around the corner, he comes around the corner

11   with them, and as you're going to the Speaker's Lobby,

12   there's an exit 20 feet to your left, right out of the

13   building.  No officers were there.  Some members of the

14   group that he had called over actually go and open those

15   doors, allowing more rioters in, but a different defendant,

16   Virginia Spencer, who was part of that crowd, she made the

17   choice to go out those doors.  She got three months.  So I

18   think that when we get to comparators, one thing that I

19   think is relevant is the fact that Mr. Register stuck with

20   the mob and stayed with the mob all the way until the

21   shooting of Ms. Babbitt, because when you're there and

22   you're seeing people punch the glass or you're seeing

23   people, you know, screaming and pointing at members of

24   Congress and you stay there, I don't know how that can be

25   interpreted as anything other than a willingness to follow

 1      them should they breach through that barricade.

 2              THE COURT:  What did the Government ask for in

 3      that case?  It was -- is it -- is --

 4              MR. DREHER:  Three months.

 5              THE COURT:  Three months?

 6              MR. DREHER:  And they got three.

 7              THE COURT:  Okay.  Is it not -- was it -- did it

 8      happen after your --

 9              MR. DREHER:  It happened after our submission --

10              THE COURT:  Okay.

11              MR. DREHER:  -- yes --

12              THE COURT:  Okay.  Fair enough.

13              MR. DREHER:  -- or the sentencing did, I should

14      say.

15              THE COURT:  Right.

16              MR. DREHER:  So the -- I -- so what the Government

17      thinks is important is he's a member of this group even

18      apart from, sort of, the leadership role, and that alone

19      distinguishes him from many of the other misdemeanor rioters

20      who came in that day.

21              And the other thing is you know -- this is the one

22      way in which I do think his prior conduct inside the Capitol

23      -- I think it does inform a reasonable interpretation of

24      what he was intending and what he was trying to do when he

25      is standing there with that mob, because if he had entered

1   two minutes before, let's say, you know, from one of these

2   side entrances, maybe, there's a question about what exactly

3   he intended to do, but he didn't.  He had been in the

4   building at that point for almost half an hour.  It's not

5   very hard to leave the Capitol building if what you want to

6   do is leave the Capitol building.  And, you know, the video

7   where he's standing --

8                 THE COURT:  Correct.

9                 MR. DREHER:  -- there and actually gets in line,

10  right, with the other rioters and then, sort of, spins away,

11  however -- whether it's directly disobeying officers or just

12  some impulse in him where he did not want to leave, he

13  wanted -- I think the best way to characterize it is he

14  wanted to be there at the action.  This was --

15                THE COURT:  Well --

16                MR. DREHER:  -- exciting.

17                THE COURT:  -- and when -- after the woman was

18  tragically shot, he did leave then.  So I mean, I -- what

19  struck me is the various -- and I don't know how much this

20  particular factor weighs for me, but the idea that he

21  couldn't get out, well, once he determined, Yeah, maybe, I

22  don't need to be here; someone's been shot, he did find his

23  way out pretty quickly then; right?  So anyway, continue.

24                MR. DREHER:  I agree.

25                So again, the -- that's the second factor in the

1    Government's view, is just his mere presence with this much

2    smaller subset of rioters.  And, of course --

3            THE COURT:  How deeply he penetrated into the

4    building and came in proximity to the chamber.

5            MR. DREHER:  Came in proximity to the chamber and

6    -- but I think -- and I think hearing the things that were

7    being chanted and said by those folks and knowing --

8    apparently, knowing the proximity to the chamber, I think

9    there's a certain level of violence in the air, you might

10   say, when those things are being chanted and officers are

11   being overwhelmed.  I mean, in order to get to the House

12   door, they had to push past -- and this is on Exhibit-B, as

13   well -- they had to push past eight or nine officers just by

14   force; right?  The crowd just surges through them.  And so

15   yes, I think that it's getting so close to the House chamber

16   doors, but also being there when you're hearing these things

17   that are being said by the mob.  There's -- I just --

18   there's no confusion at that point that they're not going in

19   to have a nice chat about the 2020 election with their

20   elected representatives.  That's not really what's going on

21   here; right?

22           So the third factor -- and the Court mentioned

23   it -- is that he went home and factory reset his phone;

24   right?  And he said it was because he wanted to delete

25   evidence, is what he told the FBI, of him being inside the

1     building.  Now, that's what he admitted to the FBI.  I have

2     no idea what other evidence there might have been on his

3     phone.  And that, I think, is something that's important to

4     make sure that it is framed correctly, because it's a very

5     difficult intellectual exercise to sanction someone based on

6     the possibility of aggravating evidence being found on their

7     device; right?  But I do think that it's important that the

8     Court consider it.  There may have been pre-planning

9     statements; there may have been statements of intent; there

10    may have been celebratory statements right afterward.  And

11    it's hard to do this, but to think about the sentence that

12    the Court would impose had it found some of those things --

13    or the -- I should say, or the charges that Mr. Register

14    might have faced had the Government found those statements.

15    And so the reason that the Government points this out and

16    thinks it is such a big deal is because for defendants like

17    Mr. Register, if they -- if what they get is, you know, a

18    couple extra days in jail for the wholesale resetting of

19    their device for -- admittedly, to delete evidence, there

20    are going to be a lot of defendants who think that that's an

21    attractive option; right?  I mean, so there has to be a

22    significant sanction just for doing it so that it doesn't --

23    there is no incentive for defendants -- or at least the

24    incentive is lesser for defendants to walk around deleting

25    evidence when they think there's going to be, you know, a

1    coming investigation or when they recognize that what they

2    did was wrong.  So in the Government's view, that

3    destruction of evidence alone should add two, two-and-a-half

4    months, something like that, to what might otherwise be an

5    appropriate sentence just based on his conduct.

6         The fourth factor, this one, I think, is lesser

7    than the first three, but I do think it's, you know,

8    notable, given some of the statements in the Probation

9    recommendation, for example, about Mr. Register's character.

10   He did lie to the FBI twice when they came and asked him

11   what he was doing.  He ultimately came clean, but as I

12   said --

13        THE COURT:  Is that -- let me stop you there and

14   also just, you know -- I -- sure, I weigh everything.  My

15   guess is there -- well, I don't know this, but that also,

16   kind of, like, akin to disobeying the officers' orders,

17   feels like something that's probably going to be there for

18   the overwhelming number of people who are arrested for

19   January 6th; fair?  I mean, I just can't imagine -- and,

20   frankly, it's present in the overwhelming number of cases in

21   which a law enforcement officer interviews someone about

22   their criminal conduct before they're charged with that

23   conduct.  I'm not saying that means he gets a pass or that

24   means it was perfectly fine.  Obviously, you could have --

25   he could have been charged with 1001, in theory.  So I take

1    it.  But that's not particularly distinguishing for

2    Mr. Register; right?

3              MR. DREHER:  So I think a couple things.  I take

4    the Court's point, A, that, do we see this from defendants a

5    lot?  Yes.  I will say that, to be frank, in cases where the

6    defendant is facing four, five, six years in prison, it ends

7    up not being a significant thing because they're getting a

8    significant prison sentence and that prison sentence is

9    going to be driven by these other factors, but in a case

10   where there's at least a debate -- there have been two

11   recommendations made for a probationary sentence -- I do

12   think that's a big deal for someone to lie to the FBI.  I

13   mean, there's no confusion when the FBI shows up at your

14   door and starts talking to you.  Even if it's something that

15   a lot of January 6th rioters have done, I don't think that

16   they can, sort of, collectively insulate themselves from

17   some -- from that being an aggravating factor just by virtue

18   of how common it is, but I do agree that there's been a lot

19   of minimization of what happened during, sort of, initial

20   interviews.

21             But I guess what I would say, though, is there

22   were these initial two statements about, I'm not going in;

23   right?  Then he says, Okay.  I went inside.  He identifies a

24   picture of himself inside.  Then you read the rest of the

25   302 and there's some statements, kind of, like, trying to

1    convince the FBI, essentially, that, You misunderstand.  I

2    was just there, kind of -- I -- this was -- I didn't -- I

3    think he says, I was never asked to leave by law

4    enforcement.  I never ran past any law enforcement officers.

5              THE COURT:  Right.

6              MR. DREHER:  And then he says at one point, I

7    think, The officers were being cool, like, letting us stay

8    inside.  And I think when you watch the video of the, you

9    know -- particularly the mob outside of the House chamber,

10   that's just -- those are clearly minimization efforts by

11   him.  So even when he turns the corner and admits being

12   inside, he still is minimizing his conduct.

13             So the Government thinks that, yes, those factors

14   establish a five- or six-month sentence as appropriate, but

15   I'm going to go through some responses to some of the things

16   that are -- that were remarked upon by the defense and

17   Probation.  Before I do, though, I just want to note, I

18   think Mr. Register is right when he says in his sentencing

19   memo that -- or when counsel for Mr. Register, who I think

20   has done a great job in this case, notes in the sentencing

21   memo that if one were to truly believe, you know -- if the

22   FBI -- I think it was something like if the FBI really

23   believed the statements that were made by Mr. Register, it

24   would seem like he's stating the intent required for a

25   Section 1512 charge.  I tend to agree with Mr. Register on

1     that point that a Section 1512 charge could arguably apply

2     to his conduct.  I guess I can say that charge was initially

3     recommended and then debated within the U.S. Attorney's

4     Office and the U.S. Attorneys's Office, I think, is being

5     judicious in how it applies that charge, but the parties, it

6     seems like, seemed to agree that this is clearly at least a

7     borderline or arguable 1512 case.  What I don't understand

8     is how that could possibly help Mr. Register; right?

9     Because had that charge been brought and had it, you know,

10    proceeded to a plea, the guidelines range would be 15 to 21

11    months.  So Mr. Register has received this, in the

12    Government's view, benefit of not being charged with that

13    felony.  And if you're at the upper end of the misdemeanor

14    range and right below the felony range, it would seem like a

15    sentence at the upper end of the misdemeanor sentencing

16    range would be the appropriate outcome.

17          All right.  In terms of some of the things and --

18    raised by the defense's sentencing memo, so there is this

19    issue of the disparity with other defendants; right?  I do

20    appreciate the Court's attention to it and the fact that the

21    Court clearly has reviewed a lot of the prior sentences.

22    Again, I'm going to flag two that I think, when you think

23    about the conduct, really makes clear that Mr. Register

24    fitting in at five or six months is appropriate.

25          All right.  So the first is Virginia Spencer who,

1    as I mentioned, received a three-month sentence.  She

2    entered the Capitol through the same entrance as

3    Mr. Register three minutes after he did, 2:19.  She walked

4    almost exactly the same path as him --

5              THE COURT:  Mm-hmm.

6              MR. DREHER:  -- and she ends up with that mob

7    chanting in front of the House chamber.  No violence for

8    her; no property destruction for her; but unlike

9    Mr. Register, she didn't help direct or lead the mob in any

10   way.  She didn't go to the Speaker's Lobby.  She sees this

11   -- she, apparently, exits through, as I said, this exit

12   that's, sort of, on the way to the Speaker's Lobby.  And

13   while Register admitted that he wanted to get inside the

14   House chamber, Ms. Spencer did not make that kind of

15   admission.  And finally, Mr. Register destroyed evidence,

16   and Ms. Spencer, although she minimized her conduct in an

17   interview with the FBI, did not destroy evidence.  So

18   Mr. Register -- as, you know, the Government's previously

19   mentioned, we think the destruction of evidence alone would

20   -- should bump a three-month sentence up to five months.

21             There is one additional aggravating factor that

22   Ms. Spencer had that Mr. Register does not have, and that is

23   that Ms. Spencer came with her family and a child.  So that

24   is an aggravating factor in that case that's not present in

25   this case, but, again, I think if you think about some of

 1    these rioters who were at this -- the apex of the incursion

 2    getting two or three months just for participating in that

 3    mob and being present there, I think it's pretty easy, with

 4    a leadership role and destruction of evidence and sticking

 5    with the mob all the way to the Speaker's Lobby until

 6    Ms. Babbitt is shot, to get to a five-month sentence.

 7            THE COURT:  Can I --

 8            MR. DREHER:  All right.  So --

 9            THE COURT:  Can I just ask you --

10            MR. DREHER:  Of course.

11            THE COURT:  -- a few questions about that case.

12    It's Judge Kollar-Kotelly?

13            MR. DREHER:  Yes.

14            THE COURT:  And is that -- I don't really think

15    it's here nor there.  Just so I understand, though, that's

16    one where she did give a split sentence at least from --

17    I --

18            MR. DREHER:  Yes, I think that's correct, Your

19    Honor.

20            THE COURT:  Where she --

21            MR. DREHER:  I think that is --

22            THE COURT:  Where --

23            MR. DREHER:  I think that is --

24            THE COURT:  -- actually, she got -- I mean, again,

25    neither here nor there, but --

1          MR. DREHER:  Yes.

2          THE COURT:  -- three -- but three -- Ms. Spencer

3     got three months and a probationary sentence going forward;

4     is that right?

5          MR. DREHER:  And then -- yes, and then, I believe,

6     Judge Kollar-Kotelly later changed that ruling and then that

7     is now currently on appeal --

8          THE COURT:  Well, she changed it about whether it

9     was probation or supervised release, I think, if I remember,

10    but okay.  That's that case.  Okay.  Fair enough.

11         MR. DREHER:  Okay.  So then the second case that I

12    want to point to is one that, I think, most people are aware

13    of which is Paul Hodgkins.  So he pled guilty to a 1512.  So

14    he's a felony case, different in that respect, but

15    Mr. Hodgkins didn't engage in violent conduct or property

16    destruction.  He comes in not with the first wave of

17    rioters, like Mr. Register, but 40 minutes later, and he

18    enters the Senate floor unimpeded, essentially, stays there

19    for 15 minutes, and then leaves.  When he's contacted, he

20    asks to plead guilty.  He's one of the -- I think he -- he

21    was the first 1512, is my recollection, but certainly was

22    one of the first felonies, gave a full confession, turns

23    over his phone, and he got eight months.  Mr. Register's

24    case is different.  The charge is different, certainly, but

25    Mr. Register --

1              THE COURT:  Right.  But doesn't that -- I mean,

2     the charge -- that's a pretty big difference; right?  I

3     mean, the Government has decided that Mr. Hodgkins should

4     plead guilty to a felony and Mr. Register should plead

5     guilty to a misdemeanor.  That's a pretty -- that's a --

6     first of all, a decision totally at the discretion of the

7     executive.  I get it.  But it's a pretty big dividing point

8     in terms of how the Government feels these cases should be

9     handled; fair?

10             MR. DREHER:  So I think that it is -- well, I'm

11    not sure, actually, that the Government would necessarily

12    agree with that in the context of January 6th where we have

13    so many defendants, many of whom are receiving misdemeanors

14    for what, I think, we think collectively is, sort of, an

15    incredible series of events.  I guess the way that, in my

16    experience, the office has thought about it is, essentially,

17    as a spectrum --

18             THE COURT:  Right.

19             MR. DREHER:  -- but there are going to be close

20    cases that we decline to charge.  There are going to be some

21    1512 cases that are, then, pled down.  Mr. Hodgkins was

22    willing to plead to the straight 1512 charge.  I think that

23    what the Government typically would focus on in each of

24    these cases is the nature of the conduct, and I think that

25    that is really the driver of our recommendations, certainly,

1    except in cases where the guidelines apply where, obviously,

2    the guidelines are going to play a significant role in what

3    the Government ultimately recommends.

4         Now, Mr. Register's case is different; right?  The

5    charges are different.  But if you look at the conduct,

6    again, there are some aggravating factors here that were not

7    present there; right?  Mr. Hodgkins went on the Senate

8    floor.  Mr. Register did not go into the House chamber.  But

9    Mr. Hodgkins, as far as I know, did not himself -- he was

10   not himself the person who broke into the Senate chamber.

11   And it's pretty clear from his conduct and his statements

12   that Mr. Register would have gone onto the House floor, I

13   would say, if it was, sort of, an unimpeded access point

14   where he could just walk into the doors and go in with the

15   mob that he was with.  It's just that the particular group

16   he was with failed to get inside because there were members

17   currently in there -- so the law enforcement presence was

18   significant -- and because a member -- a rioter was shot by

19   members of law -- by a Capitol Police officer while they

20   were trying to get inside.  So in some strange way, again,

21   the -- sort of, the violence and vehemence of the group that

22   he was with led to this resistance or at least contributed

23   to this resistance from law enforcement that ultimately ends

24   up dispersing all those rioters, because within a few

25   minutes after Ms. Babbitt was shot, law enforcement floods

1    that part of the building and everybody's pushed out.

2           So Mr. Register came in early -- earlier, I should

3    say; stayed longer; was there when the group that he was

4    with, you know, sort of, almost got there to these fleeing

5    members of Congress, could see them; and had the same -- I

6    think, in the Government's view, had the exact same intent

7    to go into one of the chambers of Congress; and then he,

8    unlike Mr. Hodgkins, went home and destroyed evidence and

9    lied to the FBI and minimized his conduct.  So I think

10   Mr. Hodgkins, you know -- his sentence is eight months.  I

11   think a sentence of five months for conduct that has some

12   aggravators that Mr. Hodgkins did not have but is also a

13   misdemeanor is an appropriate -- especially when you, sort

14   of, add to that Ms. Spencer's baseline of three months -- is

15   an appropriate middle ground between those two sentences.

16          There's one other thing that I just wanted to

17   point out, and that is -- it's just another way of thinking

18   about this.  It is true that Mr. Register was allowed to

19   plead to the Class B rather than the Class A misdemeanor.

20   That's the -- a plea offer that's been made to most -- I

21   should say, the vast majority of misdemeanants in these

22   cases.  But I do think that it is important to remember the

23   choices that Congress made when they created this offense.

24   Congress could have made this a Class C offense with a

25   statutory limit of 30 days or a minor infraction with a

1    statutory limit of 5 days, and when Congress created this

2    offense, they said, No, we think there are going to be

3    instances of demonstrating within the Capitol building that

4    are going to be worth a sentence higher than 30 days,

5    potentially up to 6 months.  And I think one way to think

6    about this case is, what else could Congress possibly have

7    thought would merit a six-month sentence than the conduct

8    that occurred -- or I should say, a five-month sentence

9    which is our recommendation -- but than the conduct that

10   occurred in this case?  And, again, it -- this is not just

11   people who went into the Rotunda, took pictures, and walked

12   out, right, people who wandered some hallways and walked

13   out.  This is someone who helped direct a violent mob while

14   members of Congress were actually in the chamber basically

15   having to run potentially, they're thinking, for their

16   lives.  And if -- when Congress said -- or decided in the

17   statute that the most aggravated form of this misdemeanor

18   deserves six months, well, here it is, frankly, in the

19   Government's view.

20           So I think that actually, in some ways -- again, I

21   think the Government's point is it is true that there's a

22   Class A misdemeanor with a higher statutory max and it's

23   true that there's a Section 1512 felony charge out there,

24   but that's the reason Mr. Register's here with just the

25   zero-to-six range; right?  And I -- the Government does not

1    think that it further can, sort of, benefit him; by

2    comparison, the fact that either of those might have seemed

3    like appropriate resolutions.

4           All right.  Now, there's also a recommendation

5    from the Probation Office.  I will say, of course, I think

6    Ms. Willett did a great job on the PSR case and, frankly, I

7    think Probation has a tough job in these cases because they

8    only have access to the information that's conveyed to them;

9    right?  The information that's public.  That being said, I

10   do think it was -- I was surprised to see that

11   Mr. Register's conduct could be described as minimal or that

12   he's, quote, Essentially accountable for entering and

13   walking around unauthorized.  I think that there are

14   offenses like that; right?  Somebody who's -- I mean, it's

15   -- if Mr. Register was on a tour of the Capitol and decided

16   to go down a hallway where he was not allowed to access,

17   that's what I would describe as being culpable mostly for

18   entering and walking around unauthorized.

19          One way, I think, to take us out of the frame of

20   thinking about just January 6th, because I appreciate this

21   Court -- sometimes it's almost hard to get your mindset out

22   of that particular context, but just imagine for a moment

23   what we would be saying and what kinds of charges we would

24   have or what outcome we think would be appropriate if

25   hundreds or thousands of people had stormed the White House

1    grounds forcing the President of the United States to put a

2    gas mask on and hide under the Resolute Desk while a mob of

3    individuals, a select group of folks who had made it onto

4    the grounds, were outside the Oval Office chanting, Break it

5    down, break it down, and attempting to enter the office.

6    Secret Service within the Oval Office have their guns drawn

7    and Mr. Register, we're positing, directs -- sees a

8    different entrance or hears about a different entrance and

9    helps directs those individuals to another entrance to the

10   Oval Office where one of them is shot and killed by the

11   Secret Service before they're all subdued.  I think it's

12   fair to say, without guessing as to what the outcome would

13   be in those cases, that Mr. Register would be lucky to be

14   facing only six months if that were the conduct at issue.

15   And to be honest, I don't -- I struggle to see a -- there is

16   a distinction between that conduct and this one, but I guess

17   in the Government's view, it's not a huge distinction, and I

18   think that that is one way to help think about the gravity

19   of what was going on right outside the Speaker's Lobby when

20   Mr. Register was there.

21          Now, Probation also received some information from

22   Mr. Register's wife about his job and this is -- obviously,

23   this is very ordinary.  His wife calls him the most honest

24   person she knows.  Obviously, the Government's view in light

25   of the evidence is that, you know, the one chance he had to

1    be honest about this, he lied; right?  Probation also

2    reported that, I think, he was called considerate and well

3    liked by his coworkers.  That is totally possible, and it

4    sounds like he has done a good job checking in with

5    Probation -- with Pretrial Services over the last year.  The

6    Government, you know, didn't include in its sentencing

7    memorandum because it doesn't like to just, sort of,

8    gratuitously include disparaging information in the

9    memorandum, but there are some text messages that I have

10   informed the defense about that Mr. Register sent to his

11   wife about his coworkers that I will just -- I will just

12   describe them as racist text messages without getting into

13   the specifics or detailing them.  So -- and I say that only

14   because I just don't -- given that that was one of the bases

15   for Probation's recommendation, I think it's important for

16   the Court to have at least some context, what limited

17   insight we have into Mr. Register's character in that

18   respect.

19            THE COURT:  Well, let me just -- on that last

20   point, I'm not going to consider that in my sentence here

21   today.  I don't think -- I mean, I haven't been provided

22   them, but even if I had, I -- if they don't have to do with

23   this offense, I'm not sure -- I'll certainly hear from

24   Ms. Halverson.  Why are you saying -- what is your

25   representation about why those texts are relevant?

1           MR. DREHER:  I hear the Court and I understand the

2     Court's point.  The Government's view was that given that

3     the Probation recommendation made by the Probation Office

4     was based in part on representations from those who know

5     Mr. Register about him being honest and considerate and well

6     liked by his coworkers, we wanted to just make sure that

7     that is not -- the Government is aware that -- or the Court

8     is aware that is not a view necessarily shared by the

9     Government in this case.

10          THE COURT:  Well, I --

11          MR. DREHER:  That's all.

12          THE COURT:  But I don't see the connection between

13    being honest -- all the things you just ticked through and

14    well liked one way or the other by your coworkers -- I mean,

15    I don't know, you know?  You can be -- you can have a good

16    relationship with some coworkers and a bad relationship with

17    other coworkers.  I don't know.  This is so, like,

18    tangential that I just want to make a record that I'm not

19    going to consider that representation one way or the other.

20          MR. DREHER:  Okay.  I appreciate that, Your Honor.

21          So then let me wrap up by just giving the Court --

22    again, these are the four ways that the Government thinks

23    about this that, in the Government's view, lead to a

24    five-month recommendation; right?

25          So first is specific and general deterrence, the

1    fact that Mr. Register had this prior sentence of two weeks

2    for driving without a license.  Now, he's sitting here

3    because the Government caught him after he participated in

4    this violent and unprecedented riot where someone was killed

5    and then he destroyed evidence.  If this offense is orders

6    of magnitude or an order of magnitude worse than that one,

7    then the Government thinks an order -- an offense -- or

8    sorry, a sentence an order of magnitude greater --

9    especially since this one, of course, comes after those

10   offenses; right?  So he does have a criminal history in this

11   case.

12         Second, in terms of the statutory range -- this is

13   the point that was made earlier -- it's not clear who we're

14   saving the six-month or the five- -- a five-month sentence

15   for in this case other than someone who engaged in this type

16   of conduct here.

17         Third, the White House example where we think that

18   taking it out of this context and thinking about other areas

19   where something like this might have occurred makes clear

20   that a sentence of five or six months would be an

21   appropriate sentence for that type of misconduct.

22         And then fourth are these two other comparable

23   defendants that I mentioned, and I think the Government

24   places significant weight on Ms. Spencer's three-month

25   sentence and Mr. Hodgkins's eight-month sentence and thinks

1    that Mr. Register falling in between those two at five

2    months makes sense, sort of, whether you think about it in

3    comparison to either of those defendants.

4            So last year, obviously, this country saw what

5    happens when at least a segment of our country starts --

6    stops [sic] taking for granted the peaceful transition of

7    power and starts thinking about whether a day of violence

8    and -- or mayhem might be worth the criminal consequences if

9    it means they can somehow prevent an incoming administration

10   that they don't agree with.  In this case, the Government

11   thinks that the appropriate sanction, a necessary sanction

12   for the type of egregious misconduct engaged in by

13   Mr. Register on January 6th, is at least five months.  There

14   just have to be consequences for that type of misconduct

15   compared to the other folks even who were there that day who

16   themselves, you know -- anybody who went in was engaged in a

17   serious form of misconduct.

18           Thank you, Your Honor.

19           THE COURT:  All right.  Very well.

20           Ms. Halverson, I'll hear from you.

21           MS. HALVERSON:  Thank you, Your Honor.

22           And thank you to Mr. Dreher.

23           You know, despite the fact that Mr. Dreher and I

24   have very different sentencing recommendations for

25   Mr. Register, we did have a good working relationship, and

1     that was very much valued while this case was going on.

2             I don't want to just vomit what I wrote in my

3     sentencing memo back to you.  It sounds like you read it.

4             THE COURT:  I'm anti-vomit in my courtroom.

5             (Laughter.)

6             MS. HALVERSON:  It sounds like you read it pretty

7     thoroughly.  And so I don't take it that I need to repeat

8     everything, but there are some points I'll just hit for Your

9     Honor's edification.

10            So I think January 6th was a hard day for many

11    Americans.  That day shattered the notion that even when the

12    country is divided, that we would still abide by the tenets

13    of democracy and not mob rule.  Many people, including

14    myself, watched horrified as the Capitol was overrun that

15    day, where people were storming the Capitol and the Capitol

16    Police officers were unable and ill prepared to deal with

17    that situation.  Mr. Register, as a member of the crowd that

18    participated in that anti-democratic process, was wrong and

19    Mr. Register knows that he's wrong, but perhaps --

20    perhaps -- it's necessary to divorce the feelings of January

21    6th and the hypothetical what-ifs of what could have

22    happened that day and the virulent political divisions that

23    that day magnified for us.  Perhaps, as with all sentencings

24    in federal court, it is necessary to look at the actions of

25    Mr. Register that day as well as his personal history and

1    characteristics.  Perhaps it is necessary to sentence

2    Mr. Register as an individual and not as a symbol.

3              THE COURT:  Not perhaps.

4              MS. HALVERSON:  I'll just -- I -- thank you.

5              So Mr. Register did not enter -- or I'm sorry,

6    Mr. Register did enter the Capitol building on January 6th.

7    He did so after attending President Trump's rally.  He

8    walked up the steps, and even with evidence to the contrary,

9    he decided to enter a building he knew he should not have

10   entered.

11             When he entered the building, it was through a

12   door that was already breached and there were no law

13   enforcement present.  Now, I talk about, in my sentencing

14   memo, the reason that there were no law enforcement present.

15   There were no law enforcement present at the Senate wing

16   doors because they had already, sort of, abandoned that area

17   in order to regroup themselves because they had already had

18   a pretty nasty incursion with people -- with protesters, but

19   from Mr. Register's perspective, at the time that he entered

20   the building, there were no law enforcement members present.

21   It was just other protesters streaming in.

22             He went down a corridor, didn't know where he was

23   going, and as part of these cases, I have been able to take

24   a tour of the Capitol building, and it is very difficult to

25   have any idea where you are in that building.  There are not

1    -- there's not a lot of signage and I really -- I mean, my

2    husband would say differently.  I think I have a very good

3    sense of direction, but I very much believe that I could

4    wander around in that building for days and not have any

5    idea the orientation of where I was during that.  So to

6    argue that Mr. Register knew exactly where he was going in

7    that building, I think, kind of, belies credibility.

8               THE COURT:  But hold on.  And just to be clear, I

9    don't know that that's what Mr. Dreher argued, and I agree

10   with you to the extent he did argue it.  Particularly if you

11   aren't in there regularly, there's no particular reason to

12   think, you know, you would know exactly where you were

13   going.  Of course, that doesn't mean, though, again, just

14   based on the evidence that's been submitted to me, that it

15   wasn't very clear to him from the way he reacted and the way

16   he was waving the group over that this wasn't -- that he

17   wasn't aware that this was a clearer path to the mob's --

18   the destination they were seeking.  It -- am I wrong in

19   drawing that inference from what's been submitted here?

20              MS. HALVERSON:  I don't think you're wrong.  And

21   to be honest, when I saw that CCTV footage, I called

22   Mr. Register immediately and said, like, Oh, my God.  What

23   were you thinking?  And his response to me was, like, Other

24   people were yelling at it.  I was excited.  So I wanted

25   everybody to come over, too.  I don't think it was as

1    calculated as the Government puts out that he saw that, Oh,

2    this is where members of Congress were, and so he was waving

3    people over to members of Congress.  I just don't think it

4    was that calculated in that instance.

5            I think, you know -- Mr. Register made the

6    decision to stay in the building.  He did.  There's nothing

7    I can say about that except that he decided to stay in the

8    building.  He didn't go in for four minutes and then leave.

9    He didn't take a selfie and then leave.  He stayed in the

10   building.  And, you know, he followed a large crowd through

11   Statuary Hall and ended up where we now know was an entrance

12   point to the House chamber, but, again, as somebody that was

13   in the Capitol and was able to view it and watching

14   Mr. Register's movements in the Capitol, it's not at all

15   clear to me that he knew that where the crowd bottlenecked

16   was actually -- the other side of that was the House

17   chambers.  There's not a sign that says, Here's the House.

18   Here's the entry point.  It's just a corridor.  There were

19   people that were bottlenecked into the corridor, and then

20   there was another corridor that led away, and then he

21   decided to move away from the bottlenecked portion into an

22   emptier corridor.

23           THE COURT:  Well, this might be a good time -- I'm

24   sorry to interrupt, but I realized Mr. Dreher did not

25   specifically argue -- we -- he didn't specifically make an

1    argument -- and I'll -- I guess I'll give him -- if I give

2    him a moment to rebut you, he can address it then, but you

3    might -- maybe, this is a time for you to address the issue

4    of the statements because, you know, the statements, kind

5    of, interact with the video to some degree in this point

6    you're making when they talk about -- I mean, I think the

7    disputed -- actually, it's not -- it appears to me -- be a

8    portion you disputed in the -- connection with the

9    sentencing memo but not necessarily something the Government

10   reiterated in the stipulation, but the point is there was a

11   -- there's a passage on the second paragraph of the 302:

12   While pushing further into the building, Register came

13   across a secured doorway where he can see what he thought to

14   be members of Congress on the other side, at which point, he

15   thought to himself, We made it.  Now, they know we're here.

16   So I -- and then, you know, the other sentence is that, you

17   know -- suggests that he knew they were in the process of

18   certifying the vote -- I don't know why that would be very

19   controversial -- but that he thought that his presence in

20   the Capitol would help affect Congress's decision and he

21   wished they were actually make -- they were actually able to

22   make it to the House chamber to show their support.

23           Talk to me about why -- I mean, you know, because

24   I do think those statements interact with the evidence

25   you're talking about here now about, Well, what the heck was

1    he doing running around waving people here and there if it

2    wasn't -- because certainly, if I accept those statements, I

3    think the contextual evidence is, consistent with those

4    statements -- if I accept those statements, it's an even

5    stronger conclusion, but I -- tell me why -- tell me what

6    your argument is on those statements.

7         MS. HALVERSON:  So let me start by saying that

8    this entire issue did not even come up or register, so to

9    speak, until the sentencing memorandum submitted by the

10   Government and until the PS- -- the draft PSR came out.  I

11   had multiple conversations with the Government and this was

12   never raised as an issue that was either going to mitigate

13   or aggravate Mr. Register's sentencing.  And, in fact,

14   because he was offered the petty misdemeanor, I did not find

15   it necessary to go through every piece of discovery that was

16   given to me and object or disagree with that.  So to be

17   fair, this issue is, sort of, an issue that wasn't expected

18   to be coming out, and when it did come out, the plea had

19   already been entered, of course, and we were getting ready

20   for sentencing.  I called Mr. Register immediately --

21        THE COURT:  But hold on, Ms. Halverson.  When

22   you --

23        MS. HALVERSON:  Yeah.

24        THE COURT:  -- say you weren't going through every

25   scrap of discovery, okay, fair, but this is, like, the 302

 1   of your client.  I mean, right?  And --

 2            MS. HALVERSON:  No --

 3            THE COURT:  And you're right to say -- at some

 4   place, I think you said this -- that, you know, it's not --

 5   the Government didn't make it a part of the statement of

 6   offense.  They could have bargained that.  They could have

 7   said, you know, We won't give him this plea unless he

 8   concedes that he said these words, and they didn't, and

 9   so okay, but it's not like the presence of the -- so I

10   guess, number one, it being in your client's 302, I would

11   think that it's something that you would have seen, but

12   putting -- put all that aside.  You would have recommended

13   that he take a plea to this offense regardless of whatever

14   dispute there might be about this statement, I feel

15   confident, and we would be right back where we are now,

16   right, arguing, like, Well, either he said it or he didn't,

17   and I have to decide to a preponderance whether he did or

18   did not.  So I don't think you've been -- I mean, you're --

19   you -- I don't think you've been prejudiced by the way this

20   played out.  Do you -- I mean, do you think?  I mean, I --

21   he would -- we would be right here in a misdemeanor posture

22   unless the Government decided, No, no, no.  Now, we're going

23   yank our plea offer.  So -- I don't know.  I --

24            MS. HALVERSON:  Here's what I'll say.  I did see

25   the 302.  It didn't seem like it was necessary for me to go

```
1    back to the Government and dispute it seeing as how it
2    wasn't made part of the plea agreement.  Had it come in as
3    part of the plea agreement or statement --
4              THE COURT:  Sure.
5              MS. HALVERSON:  -- of offense, it would have been
6    a topic of conversation.  And I will say that had that come
7    in and it's part of the statement of offense, I'm not
8    sure --
9              THE COURT:  Right.
10             MS. HALVERSON:  -- that Mr. Register would have
11   agreed to plea --
12             THE COURT:  I'll --
13             MS. HALVERSON:  -- and agree to that statement of
14   offense.
15             THE COURT:  I totally get that and, in fact, given
16   the position you're taking here, I doubt he would have.  But
17   who knows?  But the point is they didn't make that a -- I
18   mean, I, you know -- again, you -- the fact that now the
19   parties disagree about this statement, it just seems to me
20   the Government could have played some -- like, more hardball
21   about it and said, Well, he either agrees or he won't get
22   this deal, in theory, but they didn't, and your client has
23   been advantaged by that, I mean, arguably -- not arguably --
24   I mean, he has been by being able to plead to this
25   misdemeanor, and it's not uncommon that there be a fact out
```

1    there in the world that is not -- that the parties just

2    agree to disagree on and, you know, you put on whatever

3    evidence, you make whatever argument, the Court decides, and

4    we all move on.  So I don't think that's -- I don't think

5    anybody's been -- certainly, it doesn't seem like your

6    client has been disadvantaged in any way or that anybody's

7    -- I don't know -- playing, you know -- that anybody did

8    anything improper, but I do think it's something I have to

9    consider now that it's been put in front of me, and I think

10   how it interacts with some of this video evidence is

11   important because if he -- if -- I would say this.  If he --

12   if he said something along those lines, it casts what the

13   video shows in a different light than if, you know, he --

14   well, I wouldn't say it casts it in a different light.  It,

15   sort of, confirms, at least to me -- it, sort of, confirms

16   what I think it would be reasonable to conclude even without

17   it.

18              MS. HALVERSON:  So I'll just be very frank, then,

19   and, kind of, go down the list of the statements in the 302

20   and what Mr. Register has proffered to me in response to

21   those statements --

22              THE COURT:  Okay.

23              MS. HALVERSON:  -- so that we're, sort of, on the

24   same page about where the dispute lies.

25              So I asked Mr. Register about whether or not he

1    saw members of Congress through the doors of the lobby, and

2    he said, No, I didn't see anybody and I never said that.

3    Unequivocal.  No.  So that's a disputed statement.

4    Mr. Register did not say that he saw members of Congress

5    through the doors.

6              THE COURT:  Okay.  Or someone he thought was?

7              MS. HALVERSON:  Correct.

8              THE COURT:  Right.  Okay.

9              MS. HALVERSON:  Mr. Register did not say that his

10   intention was to disrupt Congress.  He said --

11             THE COURT:  Well, that's not --

12             MS. HALVERSON:  Well --

13             THE COURT:  In fairness --

14             MS. HALVERSON:  I'm sorry, to affect Congress.

15             THE COURT:  Right.  I mean --

16             MS. HALVERSON:  It's -- what he told the FBI agent

17   when they asked him was that he wanted Congress to do their

18   job.  That was the wording that he used that he remembers

19   saying, and whether or not the FBI agent actually wrote that

20   down accurately or not is another matter, but he did not say

21   that, My -- thought that my decision was going to affect

22   Congress.  Mr. Register disputes saying that.  The

23   implication of whether or not, if you're doing your job,

24   that could affect Congress, maybe, it's there, but he didn't

25   -- that's not a quoted statement from Mr. Register.  That

1    sounds like it's an interpretation of a statement that the

2    FBI agent is writing down, and --

3              THE COURT:  Why would it be -- I mean, I guess, do

4    you have anything to argue to me, though -- why would it be

5    necessary to be present in the chamber or in the Capitol?

6    Congress -- as far as I know, they may well be doing their

7    job right now.  There's no need for anyone to break into the

8    Capitol and be present on the chamber floor to ensure that

9    that happens.  So if not to affect the proceeding, why did

10   -- what's the -- what -- why did he feel he needed to be

11   present?

12             MS. HALVERSON:  Mr. Register, just to -- the

13   fourth point is he never -- he disagrees that he ever said

14   that his intention was to get into the House chambers or

15   that his -- he wanted to get into the House chambers, and

16   when I asked Mr. Register about that statement, he said,

17   Those aren't even, like, parts of my vocabulary.  That's not

18   even something that would ever come out of my mouth.  I have

19   no idea where he got that from.  I did not say that.

20             And so, again, because this wasn't necessarily

21   relevant information to the plea of demonstrating and

22   parading, you know, I, sort of, pushed it aside a little bit

23   because it just didn't seem -- I mean, it was a disputed

24   fact, but the more that I thought about it and when this

25   became an issue, the more I thought I have all of these

1    other January 6th clients that are charged with a

2    1512(c)(2), and if any of those clients would have said

3    something like the FBI agent said that he said, that would

4    be key slam dunk evidence done for intent, and I cannot

5    understand for the life of me why, if this 302 was to be

6    believed -- which, by the way, was an unrecorded,

7    un-Mirandized statement where the FBI agent went up to

8    Mr. Register at his work, surprised him, and said, Hey, I

9    heard you were a witness to a shooting, and that's how the

10   conversation started -- I just have a hard time believing

11   that the Government would have just ignored that evidence

12   and not pursued it, especially with all of the 1512(c)(2)

13   charges that they have chosen to pursue, given the track

14   record of these cases.

15            I also think that even if we want to make the

16   argument that he was, kind of, a 1512 but, kind of, a

17   misdemeanor, why not push for the misdemeanor that's the

18   Class A misdemeanor that can be supervised release if he was

19   really that bad?  I just think, for whatever reason, when

20   the Government was charging this case and when the plea deal

21   was offered, either they missed this to begin with and

22   didn't see it until they started doing the sentencing memo

23   and thought, Oh, jeez.  Now, I've got some really good,

24   yummy aggravating facts that I can try to push a really

25   yucky jail sentence, or they saw it to begin with and

1     decided this really isn't credible and it doesn't actually

2     go to his intention.

3               THE COURT:  Okay.  I could think of some other

4     possibilities, too, but okay.  I mean, I understand your

5     view on it.  I think -- I will say, then, your -- I think --

6     I wish I -- I don't know what your other cases look like

7     that had been charged as felony 1512 cases.  My suspicion is

8     that many of them have more violence associated with them,

9     but you're making it look like, maybe, not.  So I don't

10    know, you know?  But I will say that I think it is, then,

11    incumbent upon you in -- there are plenty of cases, though,

12    with folks, sort of, wandering around in various, you know

13    -- in Statuary Hall, in the Rotunda.  I do think -- again,

14    put the statements aside -- that waving -- the -- that --

15    the -- that video, boy, it looks very intentional; right?

16    It looks very -- it's somebody who's very intentional about

17    getting someplace and is very excited that here is a

18    different, maybe, path toward there.  So I mean, I'm -- I'll

19    say, I think that there's at least -- I think you're going

20    to have to, you know, argue to me why it doesn't -- why that

21    -- again, statements aside, why that really isn't what it

22    seems like it could be.

23               MS. HALVERSON:  Yeah.  I mean, I think the answer

24    to that, Your Honor, is that we were not there at the time.

25    We have CCTV footage that's imperfect.  I have the

 1    recollections of my client telling me why and how he did it

 2    and, maybe, that's unsatisfactory to Your Honor and, maybe,

 3    that's unsatisfactory to the Government, but it is

 4    Mr. Register's truth and there isn't evidence to the

 5    contrary that, I think, is credible.

 6              THE COURT:  Tell me -- so repeat -- if you've

 7    already said it, repeat it to me.  I mean, what is the

 8    explanation, then?

 9              MS. HALVERSON:  Mr. Register left the area that

10    was bottlenecked which we now know --

11              THE COURT:  Right.

12              MS. HALVERSON:  -- was the House chambers,

13    walked --

14              THE COURT:  Right.

15              MS. HALVERSON:  -- down the corridor, and saw

16    another hallway where there wasn't a bunch of people.

17              THE COURT:  Yes.

18              MS. HALVERSON:  Seeing the bottlenecked crowd, he

19    thought, We should come over here.  Maybe this is a way.  I

20    don't know that he knew it was a way into the House's

21    chambers, and I don't know that he had any idea of where

22    exactly he was directing people.  It was just an empty

23    corridor where the crowd was no longer bottlenecked if they

24    spread out.

25              THE COURT:  Okay.

 1          MS. HALVERSON:  So --

 2          THE COURT:  Okay.

 3          MS. HALVERSON:  And, again, I think it's a

 4   mischaracterization, and I am grateful to Your Honor for,

 5   sort of, drilling down on the idea that Mr. Register is not

 6   a but-for cause of Ashli Babbitt's death.  I think there was

 7   a variety of circumstances that caused that incident to

 8   happen.  Somebody -- I'm sure that Your Honor's probably

 9   seen the full video.  I have seen the full video of that

10   incident.  There were decisions and there were seconds where

11   decisions were made, and at the end of it, there was a

12   fatality.  There were officers that decided to move away

13   from the doors to let other officers in tactical gear come

14   up the stairs and take over, and it was in that --

15          THE COURT:  Right.

16          MS. HALVERSON:  -- second that she decided to

17   lurch into the -- that -- the door, and then from the

18   interview that that agent later gave to the news, it was

19   very clear that he had not actually intended to shoot her in

20   the neck.  So there was really a constellation of things

21   that happened that resulted in her death, and I just don't

22   think that it's fair to characterize Mr. Register as being

23   somebody that's a cause of it.

24          THE COURT:  If it's a cause, it's a pretty

25   attenuated connection.  And I'll just say, I don't even

1  think it's -- you've got the things that you're going into

2  here about what happened in that moment.  I also think -- I

3  mean, again, given what is shown on that video, he's not

4  even really a but-for cause of that mob being directed in

5  that direction.  There were other people, you point out,

6  slightly -- a millisecond before him, but there were other

7  people waving them in that direction, too.  So it's not even

8  clear -- I still think that doesn't get him off the hook --

9          MS. HALVERSON:  I agree.

10          THE COURT:  -- for assuming that -- and I'm not --

11  you're not arguing that -- for assuming that directional

12  role which turned out to be important, and I think it's fair

13  to say that, like, consequences matter in the criminal law,

14  but at a minimum, I think those consequences are that that

15  mob -- he contributed to that mob ending up very close to

16  the House chamber.  The -- I think that causal connection,

17  even if it's not but for, he con- -- he certainly wanted

18  that to happen.  It did happen.  I think the chain of

19  causality starts to fall away a little bit when we start

20  talking about the unfortunate tragedy of that woman losing

21  her life, but continue.  Sorry.

22          MS. HALVERSON:  Yeah.  I am not a tort lawyer.

23  There's a reason I am not --

24          THE COURT:  Right.

25          MS. HALVERSON:  -- a tort lawyer.  But I mainly

1    just pointed to that because when Mr. Register read that

2    part of the Government's sentencing memorandum, he called me

3    very upset and he asked me -- he said, Do you think that I'm

4    a murderer?  And I had to explain to him that no, I did not

5    think he was a murderer and I didn't think that he knew what

6    was going to happen when he took those actions.  So --

7             THE COURT:  Right.

8             MS. HALVERSON:  -- I say that for the benefit of

9    Mr. Register mostly.

10            So you know, it -- Mr. Register came home to

11   Florida.  He did two things that were dishonest out of pure

12   fear, and I think it's understandable fear.  Although it

13   wasn't a -- it wasn't the right thing to do, I think we can

14   all understand being scared seeing the news video of the FBI

15   rounding people up for arrests, and he factory reset his

16   phone, and there's nothing that I can do about that fact for

17   Mr. Register.  He did that.

18            What I can say about that fact is that he told the

19   FBI he did it.  He gave them permission to search his phone

20   anyway and brought his phone to him [sic].  And as far as

21   destruction of evidence, my view of that is a little bit

22   different than the Government's.  The Government, in a

23   variety of these cases, has sought search warrants and

24   subpoenas for records, and they did not do that in this

25   case.  Perhaps, had they convened a grand jury and asked for

1    a subpoena for his Facebook records or his Twitter account

2    or his Parler account, they would have been able to recover

3    whatever nefarious information they seemed to believe was

4    out there that he deleted on his cell phone, but they chose

5    not to do that, and so to, then, take the next leap and say

6    he destroyed evidence, I just don't think there's proof of

7    that.   I think he factory reset his phone because he was

8    scared and he had taken pictures of himself in the Capitol.

9            THE COURT:   Okay.   But that's evidence --

10   otherwise known as evidence; correct?

11           MS. HALVERSON:   Which the Government was able to

12   recover, and he also provided them six additional photos

13   from his trip.   He also provided them the sweatshirt that he

14   was wearing.   He also provided them with his hotel receipts.

15   He provided them with evidence which, apparently, doesn't

16   seem to have any kind of weight or carry any water with the

17   Government.   So I don't think it's necessary to say, Oh, we

18   didn't charge him with the 1512 because we didn't -- he

19   didn't have the actual intention statements, and had he not

20   deleted his cell phone, then it would have been a felony

21   case.   I just don't think that bears fruit.   I think here,

22   the Government, for whatever reason -- and I don't know why

23   -- they chose not to subpoena that other -- those other

24   informations where they could have found those kinds of

25   statements or nefarious evidence that they were pointing to.

1    And so --

2            THE COURT:  I take your point, Ms. Halverson.  I

3    -- it's --

4            MS. HALVERSON:  Okay.

5            THE COURT:  It's a very fair point.

6            MS. HALVERSON:  So I also think that it's

7    important for the Court -- you saw the most recent pretrial

8    compliance report that came out about Mr. Register.  I think

9    it came out yesterday or the day before yesterday.  And in

10   my time in federal defense, I don't see a lot of very, sort

11   of, personalized comments on those reports.  I thought the

12   one that Ms. Barrett [ph] put down that was reiterated by

13   D.C. was very telling about Mr. Register, you know?  I

14   understand the Government's and the Court's need and want to

15   make sure that January 6th does not happen again.  I

16   understand the need and the want to provide both specific

17   and general deterrence in these cases.

18           What I can say about specific deterrence in

19   regards to Mr. Register is that no more is needed.  He lost

20   his job of 12 years.  He spent months unemployed.  He was

21   party to the wrath of his wife who, I will point out, is not

22   here today on his behalf.  His wife is still angry with him

23   about his decision to do this.  And it has cost her friends

24   and coworkers that she isn't able to -- she's no longer to

25   be -- able to call friends.  So he deals with that on the

1    regular at home.

2         Additionally, reporters have hounded him

3    constantly, calling his cell phone, knocking on his door,

4    trying to talk to his daughter.  He's faced the fear of

5    prison for over a year and has been on pretrial release for

6    over a year, as well.  He had to tell his stepdaughter that

7    he did something illegal which is a horribly embarrassing

8    thing to do as a parent.  He had to tell her that he was

9    flawed.  He had to tell his new employer of his actions and

10   that he may have to be terminated as a result of this case.

11   He has to live with the memory of the sound of the gunshot

12   that killed Ashli Babbitt.  And I would submit that that is

13   enough specific deterrence for Mr. Register.  He will not be

14   doing this again.

15        As far as general deterrence is concerned, I would

16   proffer to the Court that the circumstances that created

17   January 6th are unlikely to happen again.  It is unlikely

18   that a sitting President will ask his supporters to march to

19   Congress and protest his loss of an election.  If that does

20   happen again, Your Honor, and after everything this country

21   has been through as a result of that and people still decide

22   to follow that direction, I submit to the Court that putting

23   Mr. Register in jail for five months will not even cross the

24   minds of those people that would still choose to take that

25   action, much less putting him in jail for five months.  If

1   what has happened to the country after January 6th has not

2   deterred those people from doing that again, I don't think

3   that Mr. Register's sentence will.  So I don't think putting

4   him in jail for five months will suddenly make the

5   irrational think rational thoughts about whether or not that

6   is a good idea.

7            And I just, again, want to go back to the 3553(a)

8   factors which this Court is responsible for upholding in

9   sentencings.  And, you know, Mr. Register is a hard-working

10  man, he's full of integrity, he has so much pride for his

11  family, and he's kind.  He deserves the Court's condemnation

12  for his actions.  He deserves compassion and mercy, as well.

13  He deserves the opportunity to show the Court that he's

14  sorry and that he won't repeat this behavior again.

15  Probation is appropriate because it will ensure that the

16  Court keeps its finger on him and that the public will also

17  be aware if he re-offends, but I don't think that jail is

18  the appropriate sentence here.

19           Your Honor, I submit to the Court that the most

20  appropriate sentence for Mr. Register, given all the factors

21  enumerated at this sentencing, and also, my sentencing

22  memorandum, is the probationary disposition and a

23  restitution order of $500.

24           And I think that Mr. Register would like to give a

25  very short statement to Your Honor, if you'll allow it.

1          THE COURT:  Of course, I will.  He has that right.

2          Mr. Register, you have the right to present any

3     information you want to to me that you think would mitigate

4     your sentence.  If you'd go ahead and take the stand there.

5          And I'll just say, I'm not sure -- for the folks

6     in the gallery, I don't -- I'm just noting this for the

7     record.  So Mr. Register is addressing me from there because

8     he is unvaccinated against the COVID-19 disease.  So if

9     anyone wants to slightly move further away from where

10    they're sitting, you may.

11         I didn't mean to -- Mr. Register, I don't want to

12    belabor the point, but I'm trying to balance hearing from

13    you and being able to see you with the health and safety of

14    everyone else here in the courtroom.

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Sir, you may proceed as long as -- is

17    the microphone there and working?

18         THE DEFENDANT:  I have no excuse for my actions.

19    I have no one to blame but myself.  If there's anything I

20    can say about my conduct, it is that my actions were

21    completely spontaneous and without thought.  To the D.C.

22    Police, members of Congress, and the American people, I

23    truly am sorry.

24         THE COURT:  All right.  Thank you, sir.  You may

25    return to your seat.

 1              Let me just ask, Mr. Dreher -- is it Dreher?  Is

 2      that how you say your name?

 3              MR. DREHER:  Dreher.

 4              THE COURT:  Dreher?  All right.

 5              Mr. Dreher, do you want to just address the issue

 6      of the statements?  You didn't address it in your original

 7      allocution and I brought it up with Ms. Halverson and I just

 8      want to give you the opportunity to say whatever you're

 9      going to say about that one point, if you'd like.

10              MR. DREHER:  Thank you, Your Honor.

11              You know, obviously, the Government went out and

12      got a stipulation to what --

13              THE COURT:  Right.

14              MR. DREHER:  -- these two agents would testify to,

15      and the reason we did that is because otherwise, we'd have

16      them here.  That's the only reason that they're not here,

17      frankly, testifying about what was said.  It sounds like

18      there may have been a misunderstanding on the Government's

19      part about exactly which statements were disputed.  Our

20      understanding was that the stipulated ones were the ones

21      that were disputed or, said another way, that, essentially,

22      Mr. Register agreed that the agents would come in and

23      testify, you know, that that's their recollection of what

24      was said.  He just disputed that that's actually what he

25      said to them.

1          You know, I guess one thing I would say is it's

2     obviously completely normal to have additional evidence and

3     context introduced at sentencing.  All the video exhibits,

4     you know, none of them are part of the statement of the

5     offense.  They all add context.  I think Ms. Halverson just

6     got up and gave a very, you know, impassioned speech that

7     included dozens of statements and thoughts and ideas from

8     the defendant himself.  The defendant's not going to take

9     the stand and testify to any of that.  So I just -- I don't

10    think that there was, as the Court noted, anything wrong

11    with the way in which this played out.  It's actually very

12    common.  Some defense counsel insist at the statement of

13    offense phase, frankly, that we limit things to the elements

14    of the offense and say, you know, additional facts can come

15    in at sentencing.

16         So we would say that based on the stipulated

17    testimony of those two FBI agents, no contrary testimony

18    from anybody who's going to get up and testify to these

19    things, that that's fully sufficient for the Court to find

20    that those statements were made, especially, as the Court

21    noted, when the statements seem awfully consistent with the

22    conduct that's found on video and his location; right?  I

23    mean, it would be one thing if Mr. Register was at a totally

24    different place in the building and said, I didn't, you know

25    -- I was just confused about where I was, but he was right

1    next to the House chamber with the mob trying to get into

2    the House chamber and waved them around and then later said,

3    I, you know -- I was trying to get into the House chamber.

4    So we think the nexus of those two things is more than

5    sufficient for the Court to rely on those.

6              THE COURT:  All right.  Ms. Halverson, do you have

7    any response to that?  I don't think you would, but I guess

8    I just want to make sure you don't.

9              MS. HALVERSON:  No.  I think Mr. Register's

10   stipulation speaks for itself.  I do think that Mr. Register

11   would agree that the FBI would come in here and say that

12   what they report -- what they put in their report --

13             THE COURT:  Right.

14             MS. HALVERSON:  -- was true.

15             THE COURT:  Right, right, right.

16             MS. HALVERSON:  And so that's what we agreed to,

17   but the characterization of that is what's at issue.

18             THE COURT:  All right.  Very well.

19             All right.  Let's take a 15-minute recess, come

20   back at 4:00 o'clock.

21             THE DEPUTY CLERK:  All rise.  This Honorable Court

22   stands in recess for 15 minutes.

23             (Brief recess taken.)

24             THE COURT:  All right.  Apologies for keeping

25   everyone waiting a little longer than I anticipated.

1          First, let me just start by resolving the factual

2     questions.

3          I do find by a preponderance of the evidence that

4     Mr. Register did say words to the effect of what's in the

5     302 and -- well, words to the effect of what's in the 302

6     that are also covered by the stipulation the Government has

7     submitted, I think, for a couple of different reasons.

8          One, I think -- and to be clear, those are the

9     words that, quote, Register was aware that Congress was in

10    session and that they were in the progress -- process of

11    certifying the vote.  Register felt as though his presence

12    at the Capitol would help affect Congress's decision.

13    Register wished that they were actually able to make it into

14    the House chamber during the certifying process to show

15    their support for President Trump.

16          I think, on the one hand -- I have a stipulation,

17    on the one hand, of sworn testimony from an officer.  I

18    don't have anything sworn on the other side.  I think those

19    statements are consistent with the video evidence in the

20    case and which I think -- in which Mr. Register very

21    pointedly and excitedly and energetically waves the mob

22    what -- as it turned out, which is toward the entrance to

23    the Speaker's Lobby.  And I think I have reason to doubt

24    representations to the contrary, given that Mr. Register was

25    not fully truthful with the FBI at the beginning about his

1    conduct that day.

2            So for all those reasons, I'll resolve the factual

3    question to a preponderance of the evidence in that way.

4            All right.  Now, on to the sentencing factors.

5            I have assessed the particular facts of this case

6    in light of the relevant 3553(a) factors, including -- well,

7    in this case, not including the sentencing guidelines.  And

8    so, Mr. Register, I'm going to provide my thoughts for the

9    record and for you about the different factors that I have

10   to consider.

11           So let me begin with my considerations with regard

12   to the nature of the offense.  And this is really the

13   hardest thing that I and many of my colleagues have to

14   grapple with in these cases.  What happened that day was, in

15   some ways, as serious an -- as an offense as there can be,

16   given that it threatened the peaceful transfer of power from

17   one president to another.  The damage that was done that day

18   was both tangible and intangible.  And, Mr. Register, your

19   role was not the most serious of everyone who was there that

20   day.  That's for sure.  And we'll get to your exact role,

21   but I want to say a few things about the overall events of

22   January 6th insofar as I have to consider the nature and

23   circumstances of the offense.

24           Mr. Register, our constitution and our laws give

25   you rights that people in other countries would do just

     1    about anything for and that many Americans who have come

     2    before us have died for.  In fact, people are losing their

     3    lives right now for these kinds of rights in Ukraine right

     4    at this moment right as we're proceeding.  You have the

     5    right to vote for whoever you want to for President.  You

     6    have the First Amendment right to speak out in favor of your

     7    candidate, to put up signs, to convince your friends and

     8    neighbors to vote for that person.  If you don't like how an

     9    election is being conducted, you can speak about that, too.

    10    You can call, you can write, you can try to meet with

    11    elected officials in your state or in the Federal

    12    Government, you can try to get election laws changed, you

    13    can engage in peaceful protest here or in your state

    14    capital, and if you think you've been wronged and you think

    15    you have a case, you can come in and file a lawsuit in state

    16    court or here in federal court, but freedom means that with

    17    those rights come responsibilities, and so what you cannot

    18    do under any circumstances is become part of a mob that,

    19    using violence and the threat of violence, disrupts

    20    Congress's ability to fulfill its role to process the

    21    certification of the Electoral College for president.  What

    22    happened that day not only damaged property and injured

    23    people; it was a blow against the customs and the practices

    24    that helped support the rule of law and the constitution.

    25    It snapped our previously unbroken tradition of the peaceful

1    transfer of power, and we can't get that back, Mr. Register.

2    We can't get it back.

3            So it was more than extremely serious, what

4    happened that day.  It was a national disgrace, and you

5    played a role in that.  So let's turn to your role.  In some

6    ways, it was quite limited.  You weren't a part of any group

7    that came to the Capitol that day.  There's no evidence that

8    you engaged in any kind of prior planning.  You didn't

9    engage in violence against anyone -- any law enforcement

10   officer, you didn't cause any property damage directly, you

11   didn't bring a weapon there, and you did not engage in any

12   kind of public display of celebration or a public display

13   that you -- you didn't celebrate what happened that day or

14   make it clear that you had no remorse for what happened that

15   day.  I don't take too much one way or the other, to be

16   honest, from what the Government recovered from your phone.

17   I just don't think it says much -- anything about you or

18   your views about that day one way or the other.

19           There are three things, though, as I -- where I

20   started that, I think, makes you stand out a little bit,

21   though, from the run-of-the-mill person who might have been

22   caught up in what happened that day, and I'll start with the

23   biggest one first.  At a critical point, you stepped into a

24   role to help direct the mob, very enthusiastically -- very

25   enthusiastically -- pointing the mob toward what turned out

1    to be the Speaker's Lobby which is just a few feet away from

2    the House chamber.  Other people were waving -- at least one

3    other person -- maybe, there was somebody else, but at least

4    one other person did that, too.  I don't know that I -- I

5    mean, I don't weigh that very much.  I believe you didn't --

6    you might not have known precisely what you were waving

7    people to.  I, you know -- okay.  But I do think I can infer

8    you knew you were waving people towards something that would

9    get you all closer to your goal of being as close to the

10   House chamber as possible.  Given how excited you were, I

11   don't think -- well, I'll get to that in a second.  So I do

12   think I can infer that.

13        Look, that's a pretty minor role when it comes to

14   leadership.  There were people who engaged in leadership

15   that day far beyond that.  And I believe you that that was a

16   spur-of-the-moment thing, but it is something you did and a

17   role you were willing to play that day.  You were not merely

18   willing to, kind of, mill around and be part of a mob.  You

19   were willing to help direct it and help direct it in a way

20   that got it much closer toward being a tragedy and

21   someone -- and one of our members of Congress getting

22   killed.  Now, as it turned out, someone was killed.  I don't

23   weigh that -- I mean, I think the contingent set of things

24   that happened to bring that about -- I don't think you're a

25   murderer and I don't weigh that -- I don't put that too

1    strongly at your feet, but the reality is I do think it's

2    pretty clear that it was something you did to get this mob

3    closer to its goal, and I don't think the explanation

4    proffered by Ms. Halverson that, basically, you were just,

5    sort of, pointing people in a direction that was not so

6    congested; that you were wanting people to be, you know --

7    that you were just, sort of, trying to spread out the crowd,

8    I don't think that's consistent with the video evidence that

9    I see.  So that's the first thing that makes you stand out.

10   I think it's -- and I don't think it's anything -- I haven't

11   seen -- and I looked at a lot of cases.  A lot.  I've

12   sentenced a few and I've seen a lot of people here, and I

13   haven't seen anyone sentenced for a misdemeanor who played a

14   role directing the mob like that.

15          You know, closely related -- maybe, you might even

16   say this is a similar thing -- but I do think, you know,

17   your statements to the FD -- FBI make -- and that I do --

18   that I did find occurred -- whatever the precise nature of

19   your words, I do think you were intent on affecting what

20   happened there that day.  I get you haven't been charged

21   with a 1512.  You should be -- you should feel very lucky.

22   I don't know what the charging decisions are, but I'll just

23   -- and it's, frankly, none of my business, but, you know,

24   getting the plea you did, I think, reflects some good

25   lawyering on your lawyer's part.

1           And while I'm thinking about it, let me pause and

2    say here that I thought the presentations here, the advocacy

3    to me by both the Government and the defense, were really

4    quite good and quite excellent and I commend you both for

5    that.

6           But anyway, the second part are these statements

7    that, I think -- I get you haven't been charged with an

8    obstruction count, but I've got to weigh that.  I've got to

9    weigh that in what I think is appropriate here.  You were

10   not someone who wandered in there, I don't think, to simply,

11   kind of, protest or were being led along by someone else.  I

12   think you were hoping to affect the outcome, in your own

13   words, and I think that's important.

14          And, third, you -- the reset of your phone.  We've

15   -- I think, you know, as, I think, you have to concede, that

16   was done to try to minimize the amount of evidence the FBI

17   could have received from you -- or could have obtained.  I

18   take Ms. Halverson's point.  They could have -- there could

19   have been other things they did to get that evidence.  So

20   I'm not sitting here saying I am presuming that there would

21   have been very incriminating evidence on there because I

22   don't think I can do that, but I can weigh the fact that you

23   took that action, and I think I have to.

24          So I get that you're a misdemeanant ultimately

25   here, but I haven't seen a combination of aggravating

1  factors like that so far, especially, again, the issue of

2  taking on the responsibility of directing the mob.

3      Turning to -- your characteristics as an offender

4  is something else I have to consider, and those things, you

5  know, for the most part, weigh in your favor.  I read all

6  the letters -- the character references, and it seems like

7  both from your family life and your employment, you're a

8  valued employee and that you have a family that while, right

9  at the moment, might not be so pleased with you, you have a

10  lot going for you in terms of your family in terms of your

11  wife and your child.  That's -- that all weighs, you know,

12  frankly, in your favor.  It's -- I would say it's not 100

13  percent -- and I'll mention, also -- I should -- as I

14  should, that your -- you've been great on pretrial release,

15  the Probation Office sings your praises, and that is worth

16  something.  You do have a criminal history, although it is,

17  you know, relatively minor in the grand scheme.  That's why,

18  I guess, I say -- and it does involve you having served jail

19  time and having your probation revoked.  I -- that's not

20  nothing, and that's probably the only reason why these, sort

21  of, offender characteristics don't weigh 100 percent in your

22  favor, but, of course, I have to weigh those.

23      The next factor is that the sentence has to do all

24  these things I ticked through before: reflect the

25  seriousness of the offense, promote respect for the law,

1    provide just punishment for the offense, afford adequate

2    deterrence, protect the public, and promote rehabilitation.

3    I do think that general deterrence is critical here.  I've

4    said that -- I've talked about the seriousness of the

5    offense.  I think, you know, again, it's something we all

6    struggle with in terms of separating out the collective

7    thing that happened that day from your specific role.  I've

8    talked about that.  I -- but I do think general deterrence

9    is critical here.  We can't ever have that happen again.  We

10   just can't.  And I have to weigh that in trying to figure

11   out what to do with you.

12           Turning to the types of sentences available, we've

13   talked about this.  A sentence all the way up to six months

14   of incarceration is possible in the case.  The Probation

15   Office and Mr. Register are asking for probation.  The

16   Government is asking for five months of incarceration.

17           Another factor I have to consider is unwanted

18   sentence disparities.  And, you know, normally, as counsel

19   know, this is something that largely the guidelines take

20   care of and the courts can look to the guidelines as a, kind

21   of, rough measure of what other courts do with defendants

22   with similar records who have been found guilty of similar

23   conduct.  We don't have that here.  And so I have the chart

24   the Government provided as part of its memorandum.  I have

25   other -- and I've gone through a lot of other cases, maybe,

1    up to 15 or 20 that I looked at in terms of -- and cases

2    that, Ms. Halverson, you brought to my attention in terms of

3    where courts have been making the distinction between jail

4    time and probation.  It's not always consistent.  You do

5    have outliers on both sides.  You're always going to have

6    that.  But I did look at those cases to try to get a sense

7    of what courts have been doing -- what this -- my colleagues

8    on this court have been doing to try to take those things

9    into account.

10             And then, last, I have to consider the need to

11    provide restitution.  Of course, in this case, the parties

12    have agreed on a restitution amount of $500.

13             So weighing all of those 3553(a) factors and

14    considering what is sufficient but not greater than

15    necessary to comply with the purposes of sentencing,

16    Mr. Register, I'm going to sentence you to 75 days of

17    incarceration and $500 in restitution.  That is at once both

18    significantly less than the Government asked for but

19    significantly more -- actually, as it turns out, I guess

20    it's right in the middle of -- and significantly more than

21    what your attorney asked for.  I won't, you know -- I won't

22    hide from the fact that these cases are really difficult and

23    we're all here trying to do our best to apply all these

24    factors and come up with what we think is sufficient but not

25    greater than necessary to comply with the purposes of

1    sentencing.  And I will say, I hope, again, if there's one

2    thing you've taken away -- you will take away from this is

3    that, you know, none of what -- none of -- the objections

4    that any citizen has to how an election comes out, that

5    violence and the threat of violence can never be the answer.

6    It can never be the answer.  And, as I said, there are

7    people all around the world, including today -- I think of

8    the people of Ukraine -- who would just absolutely do

9    whatever they could to have a system like we have where we

10   have so many different ways of resolving our disputes that

11   don't involve violence and the threat of violence.

12        All right.  I will now impose the sentence which I

13   conclude, after considering all the 3553(a) factors, is

14   sufficient but not greater than necessary to comply with the

15   purposes of sentencing.

16        Pursuant to the Sentencing Reform Act of 1984 and

17   in consideration of the provisions of 18 United States Code

18   3553, it's the judgment of the Court that you, Jeffrey

19   Register, are hereby committed to the custody of the Bureau

20   of Prisons for 75 days on Count 4.  In addition, you are

21   ordered to pay a special assessment of $10 in accordance

22   with 18 United States Code Section 3013.  I will authorize

23   the supervision and jurisdiction of this case to be

24   transferred to the United States District Court for the

25   Middle District of Florida.  And, sir, you are also ordered

1    to make restitution in the amount of $500.  Restitution

2    payments shall be made to the Clerk of the Court for the

3    United States District Court, District of Columbia, for

4    disbursement to the following victim.  The victim is the

5    Architect of the Capitol, Office of the Chief Financial

6    Officer, attention: Kathy Sherrill, CPA, Ford House Office

7    Building, Room H2-205B, Washington, D.C. 20515.  The amount

8    of the loss here is $500.  And you must pay the balance of

9    any restitution within 30 days of this sentencing.

10              The financial obligations are immediately payable

11   to the Clerk of the Court of the U.S. District Court, 333

12   Constitution Avenue, NW, Washington, D.C. 20001.

13              Within 30 days of any change of address, you shall

14   notify the Clerk of the Court of the change until such time

15   as the financial obligation is paid in full.

16              The Probation Office shall release the presentence

17   investigation report to all appropriate agencies which

18   includes the United States Probation Office in the approved

19   District of residence.  In order to execute the sentence of

20   the Court, treatment agencies shall return the presentence

21   report to the Probation Office upon the defendant's -- the

22   -- well, upon the defendant's completion of his sentence.

23              And, Mr. Register, under certain circumstances,

24   you do have the right to appeal the sentence imposed by the

25   Court.  If you choose to appeal, you must file any appeal

```
1    within 14 days after I enter judgment.  And if you're unable

2    to afford the costs of an appeal, you may request permission

3    from the Court to file an appeal without cost to you.

4              Pursuant to the D.C. Circuit's opinion in United

5    States v. Hunter, 809 F.3d 677, decided on January 12th,

6    2016, are there any objections to the sentence imposed that

7    are not already noted on the record?

8              Mr. Dreher?

9              MR. DREHER:  No, Your Honor, not from the

10   Government.

11             THE COURT:  All right.  Ms. Halverson?

12             MS. HALVERSON:  No, Your Honor.

13             THE COURT:  All right.  Obviously, I'm not

14   ordering Mr. Register to be remanded today.  He will report

15   as directed by the Probation Office whenever they set a

16   report date.

17             MS. HALVERSON:  Your Honor, if I could, I know

18   that it's very important to Mr. Register and Mr. Register's

19   family that he be able to attend his daughter's graduation

20   from high school in May.  So I would just ask, if the Court

21   were feeling generous, if you could put in the order that

22   the turn-in date be after June 1st so that he can make sure

23   that he can attend that important event in her life.

24             THE COURT:  Let me ask Ms. Willett.  How long

25   typically from today will a report -- do you know how long
```

1    typically a report date would be from today?

2              THE PROBATION OFFICER:  Generally, Your Honor, it

3    would be about six weeks, but because of the COVID

4    situation, it could be longer.

5              THE COURT:  All right.  What's the Government's

6    view on this request?

7              MR. DREHER:  That's okay with the Government.

8              THE COURT:  All right.  It sounds like we'd be

9    pretty close to that anyway perhaps.  So this isn't going to

10   really affect -- this isn't really going to affect how

11   things would proceed one way or the other.  So I will

12   include in the order that he should report as directed by

13   Probation but no earlier than June 1 of this year.

14             Very well.  Anything further from the Government?

15             MR. DREHER:  No, Your Honor.

16             THE COURT:  All right.  Anything further from the

17   defense?

18             MS. HALVERSON:  No, Your Honor.

19             THE COURT:  All right.  Very well.  The parties

20   are dismissed.

21             THE DEPUTY CLERK:  All rise.  This Honorable Court

22   stands in recess.

23             (Proceedings concluded at 4:44 p.m.)

24             * * * * * * * * * * *

25          **CERTIFICATE OF OFFICIAL COURT REPORTER**

1    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

2    that the above and foregoing constitutes a true and accurate

3    transcript of my stenographic notes and is a full, true and

4    complete transcript of the proceedings to the best of my

5    ability, dated this 6th day of July 2022.

6                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                              Official Court Reporter
7                             United States Courthouse
                              Room 6722
8                             333 Constitution Avenue, NW
                              Washington, DC 20001
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25